1  Jeffrey Lewis (Bar No. 66587)
2  KELLER ROHRBACK L.L.P.
   300 Lakeside Drive, Suite 1000
3  Oakland, CA 94612
   (510) 463-3900, Fax (510) 463-3901
4  jlewis@kellerrohrback.com

5  Juli Farris (Bar No. 141716)
   KELLER ROHRBACK L.L.P.
6  801 Garden Street, Suite 301
   Santa Barbara, CA 93101
7  (805) 456-1496, Fax (805) 456-1497
   jfarris@kellerrrohrback.com
8
9  *(Additional Counsel listed Below)*

10              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
11                   OAKLAND DIVISION

12 | BARBARA LEWIS, AKEMI BUCKINGHAM, | No. 4:18-cv-02248-PJH |
13 | BOBBIE JOE HULING, CYNTHIA WHETSELL, | |
   | MARTHA MERLE, ELAINA HUFNAGEL, | **CONSOLIDATED COMPLAINT** |
14 | TERESA GATTUSO, ELISSA WAGNER, and | |
   | DIXIE WILLIAMS, individually and behalf of all | **CLASS ACTION** |
15 | others similarly situated, | |
   | | DEMAND FOR JURY TRIAL |
16 | Plaintiffs, | |
17 | | |
   | v. | |
18 | | |
   | RODAN & FIELDS, LLC, | |
19 | | |
   | Defendant. | |
20 | | |

21

22      Plaintiffs, individually and on behalf of all others similarly situated, by their attorneys, for their

23 complaint against Rodan & Fields, LLC, ("Defendant" or "Rodan + Fields") allege the following based

24 on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

25      This consolidated complaint alleges consumer protection claims on behalf of classes of

26 consumers in the states of California, Florida, Illinois, Massachusetts, New York, and Washington, and

27 a nationwide class alleging a violation of the Racketeer Influenced Corrupt Organization Act (RICO),

28

18 U.S.C. § 1961.  Additionally, having provided more than 30 days' notice to Rodan + Fields, the consolidated complaint includes a cause of action under the California Consumer Legal Remedies Act.

## I.      NATURE OF THE ACTION

1.      This matter arises out of Defendant Rodan + Fields' deceptive labeling, and marketing of its Enhancements Lash Boost ("Lash Boost") eye serum ("Product").  Rodan + Fields failed to disclose the harmful side effects linked to an ingredient in their Lash Boost Product, which Rodan + Fields markets and sells throughout the United States, including in California, Florida, Illinois, Massachusetts, New York, and Washington.

2.      Rodan + Fields was started by Dr. Katie Rodan and Dr. Kathy Fields.  Since Lash Boost first entered the market in 2016, Rodan + Fields has marketed it as a cosmetic "eyelash-conditioning serum . . . clinically shown to enhance the appearance of eyelash volume and length."  But since it entered the market in 2016, Rodan + Fields has failed to disclose material facts to consumers about the existence, severity, and duration of symptoms and side effects associated with an ingredient in Lash Boost: isopropyl cloprostenate, a synthetic prostaglandin analog.

3.      Prostaglandin analogs are chemicals manufactured to be biologically equivalent to the lipid compound prostaglandin.  Prostaglandin analogs are widely used in the medical management of glaucoma,[1] to reduce elevated ocular pressure in patients with hypertension.  As a mainstay in the treatment of glaucoma, the side effects of ophthalmic prostaglandin analogs are well known among eye doctors.

4.      Although effective in treating individuals with glaucoma who could otherwise lose their vision without treatment, ophthalmic prostaglandin analogs have "potentially sight-threatening side

---

[1] Glaucoma is a complex disease in which damage to the optic nerve leads to progressive, irreversible vision loss.  Glaucoma Research Foundation, *What is Glaucoma?*, https://www.glaucoma.org/glaucoma/ (last visited Aug. 7, 2018).

effects."[2]  More common side effects of ophthalmic ocular prostaglandin use include:

- eyelid drooping, a "sunken-in" effect, and an asymmetric appearance;[3]

- increased prominence of lid vessels;[4]

- darkening of the eyelid skin and undereye skin;[5]

- increased pigmentation of the iris, changing the color of the eyes;[6]

- excessive tearing, eye pain, or lid crusting;[7]

- burning, stinging, itching, blurred vision, and the sensation of something being in one's eye;[8] and

- lengthening of eyelashes.[9]

5.     Lash Boost contains isopropyl cloprostenate, "a synthetic prostaglandin analog in the same class of compounds as the active ingredient in FDA-approved drugs indicated to lower intraocular pressure in glaucoma patients."[10]  Medical literature indicates that the side effect profiles of ophthalmic prostaglandin analogs are common to the class of drugs.[11]

6.     Prostaglandin analogs were originally indicated for the reduction of interocular pressure

---

[2] A. Alm, et al., *Side effects associated with prostaglandin analog therapy*, Nat'l Ctr. for Biotech. Info. (Nov. 2008) https://www.ncbi.nlm.nih.gov/pubmed/19038628.

[3] Stanley J. Berke, MD, *PAP: New Concerns for Prostaglandin Use*, Review of Ophthalmology (Oct. 4, 2012), https://www.reviewofophthalmology.com/article/pap-new-concerns-for-prostaglandin-use.

[4] *Id.*

[5] Michelle Smith, PharmD, BCPS, *Medication Review: Prostaglandin Analogs for Glaucoma*, Pharmacy Times (Oct. 1, 2015) https://www.pharmacytimes.com/contributor/michelle-smith-pharmd-bcps/2015/10/medication-review-prostaglandin-analogs-for-glaucoma.

[6] Berke, MD, *PAP: New Concerns for Prostaglandin Use*, *supra* note 3.

[7] Andrew A. Dahl, MD, FACS, *Glaucoma Medications*, e medicine health, https://www.emedicinehealth.com/understanding_glaucoma_medications/article_em.htm#prostaglan din_analogs_side_effects_and_interactions (last updated Nov. 20, 2017).

[8] *Id.*

[9] Smith, PharmD, BCPS, *Medication Review: Prostaglandin Analogs for Glaucoma, supra* note 5,

[10] Alonza E. Cruse, *Warning Letter*, U.S. Food & Drug Admin. (Apr. 18, 2011), https://www.eyelash-growth.com/wp-content/uploads/2017/05/rapidlash-fda-warning-letter-full.pdf

[11] Smith, PharmD, BCPS, *Medication Review: Prostaglandin Analogs for Glaucoma, supra* note 3 ("Side effects are similar across the 4 prostaglandin analogs" "All prostaglandin analogs can cause the iris or eyelid to turn a darker color because of melanin deposits."); *See also:* Berke, *supra* note 3 (indicating shrinking of orbital fat cells is *"associated with all the drugs in the class"*).

in glaucoma treatment, and while most of the known side effects of prostaglandin analogs are undesirable and potentially harmful, the ability of this chemical to lengthen eyelashes of patients using it drew attention, and efforts to develop products containing prostaglandin analogs for eyelash enhancement began, despite the risks.

7.    For example, one such product, Latisse, is an FDA-approved eyelash enhancement product, that contains the prostaglandin analog, bimatoprost.  It is available only by prescription, and its side effects are disclosed both in marketing materials and in disclosure statements that accompany the product itself.[12]

8.    While Lash Boost also contains a prostaglandin analog, its makers have marketed it as a cosmetic, and have thus evaded regulatory scrutiny without having to make a thorough disclosure of the side effects associated with prostaglandin analogs.  While all prostaglandins and their analogs, including isopropyl cloprostenate, are banned from cosmetic products in Canada, they are not banned from cosmetics in the United States.[13]

9.    Although Rodan + Fields lists isopropyl cloprostenate in its ingredient list, it does not disclose that its eye serum contains a prostaglandin analog.  Moreover, Rodan + Fields has never disclosed the similarities between Lash Boost and other prostaglandin analogs or acknowledged the well documented and dangerous side effects associated with the use of such products.  Rather, Rodan +

---

[12] *Using Latisse Safety Info*, Latisse, http://www.latisse.com/SafetyAndSideEffects.aspx (last visited Aug. 7, 2018) (Less common side effects include "skin darkening, eye irritation, dryness of the eyes and redness of the eyelids...LATISSE® solution use may cause darkening of the eyelid skin...[and] may cause increased brown iris pigmentation of the colored part of the eye which is likely to be permanent." *See also* Lupin Pharmaceuticals, Inc., *Latisse*, Drugs.com, https://www.drugs.com/pro/latisse.html (last visited Aug. 7, 2018).

[13] All prostaglandins and their analogs, including isopropyl cloprostenate, are banned from cosmetic products in Canada. Gov't of Can., *Cosmetic Ingredient Hotlist – List of Ingredients that are Prohibited for Use in Cosmetic Products*, Government of Canada, https://www.canada.ca/en/health-canada/services/consumer-product-safety/cosmetics/cosmetic-ingredient-hotlist-prohibited-restricted-ingredients/hotlist.html (last updated Dec. 14, 2015).

Fields has distinguished itself from the serious side effects associated with other drug products used to improve eyelashes, which demonstrates Rodan + Fields' knowledge of the side effects in other lash products containing prostaglandin analogs.

10.     Rodan + Fields also claims that "Lash Boost is clinically and ophthalmologist tested, and found to be safe and non-irritating."[14]

11.     Other manufacturers who have attempted to market lash-enhancement products containing prostaglandin analogs without disclosing their side effects have been reprimanded by the federal government.  For example, the FDA in April 2011 issued a warning letter to a manufacturer of another eyelash-growth product containing isopropyl cloprostenate, stating that the product "makes misleading statements regarding the product's safety and also fails to reveal material facts with respect to consequences that may result from use of the product."[15]  The letter also stated that the products "are not safe for use except under the supervision of a practitioner licensed by law to administer them."[16]  It noted that prostaglandin analogs are classified as Category C drugs, meaning "women of childbearing age are considered at risk for injury."[17]

12.     But Rodan + Fields, which markets Lash Boost as a cosmetic, has failed to disclose the harmful side effects and risks associated with use of prostaglandin analogs.  Thus, rather than allowing consumers to decide whether Lash Boost is worth the risk in light of its side effects and risks, Rodan + Fields decided to conceal them.

13.     Consumers of Lash Boost throughout California, Florida, Illinois, New York, Massachusetts, Washington, and the United States have experienced serious side effects, including

---

[14] US General FAQs, Rodan + Fields, http://www.rodanandfields.com/rfconnection/index.php/category/us/general-faqs-us/ (last visited Aug. 8, 2017).
[15] Cruse, *Warning Letter*, *supra* note 10.
[16] *Id.*
[17] *Id.*

changes in iris color, eyelid drooping, eyelid discoloration, thinning and loss of eyelash hair, eye sensitivity, eye infections, and vision impairment.  But instead of disclosing the harmful side effects and risks associated with the use of Lash Boost and letting consumers decide if Lash Boost is worth the risk, Rodan + Fields omitted these facts and engaged in a misleading and fraudulent scheme to defraud the public and engaged in fraudulent, unfair, and unlawful marketing and labeling practices.

14.     Indeed, it has concealed these effects with product labeling that was materially misleading even though Lash Boost users have reported scores of incidents throughout the United States in which they have experienced many of the serious side effects described above.

15.     Without disclosure of the true risks and side effects that result from its use, sales of Lash Boost soared.  In 2016, Rodan + Fields exceeded $1 billion in sales[18] and was the top-selling skincare brand in the United States.

16.     This action seeks to compensate consumers who purchased Lash Boost at the cost of approximately $150 per tube, not knowing the truth about the product they were spending so much money on.[19]

17.     In marketing and labeling Lash Boost, Defendant violated various state consumer protection laws and engaged in fraud.  Accordingly, Plaintiffs bring this action against Defendant on behalf of themselves and all those similarly situated who purchased the Product in the states of California, Florida, Illinois, Massachusetts, New York, and Washington during the applicable statute of limitations period, seeking to recover monetary damages and other relief pursuant to those states' consumer protection laws.

18.     This action also alleges that the makers of Lash Boost, Rodan + Fields, violated the

---

[18] Michelle Castillo, *How Rodan + Fields bought back their skincare company and topped $1 billion in sales*, CNBC (Dec. 30, 2017), https://www.cnbc.com/2017/12/30/rodan-fields-selfies-and-social-media-1-billion-revenue.html.
[19] This action does not allege that Lash Boost is subject to FDA regulation or should have been regulated by the FDA.

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, by engaging in a scheme to defraud the public so that Rodan + Fields could profit from the sale of Lash Boost. This scheme directly and foreseeably caused consumers to purchase Lash Boost without knowing the full extent of its harmful side effects.

## II.   PARTIES

### A.   Plaintiffs

19.    **Plaintiff Barbara Lewis** is an attorney and a resident of Ventura County, California.

20.    Plaintiff Lewis purchased Lash Boost in February 2018. Prior to using Lash Boost, Ms. Lewis was not pregnant or nursing. She was not being treated for an eye-related disorder and was not undergoing cancer treatment. She did not have a history of styes, nor was she prone to dry eyes.

21.    Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scarring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

22.    Ms. Lewis was also not aware that an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

23.    Had Ms. Lewis been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

24.    Ms. Lewis first used the product once or twice in February 2018. In March of 2018, she used Lash Boost for approximately two weeks. Three days after stopping use of Lash Boost, Ms. Lewis developed a chalazion on her right eye. A chalazion is a small bump that appears on the eyelid due to blocked oil glands. After developing the chalazion, Ms. Lewis stopped using Lash Boost.

25.     Three days later, Ms. Lewis developed a hordeolum (otherwise known as a stye, or a bacterial infection of an oil gland in the eyelid) in her left eye.

26.     Three days after developing the hordeolum, she developed blepharitis (inflammation of the eyelids) and was placed on antibiotics due to the infection.  Ms. Lewis went to the doctor three times, including to a specialist.  Below is a photograph of Ms. Lewis' eyes after using Lash Boost.



27.     **Plaintiff Akemi Buckingham** is a resident of Riverside County, California.  Plaintiff Buckingham purchased Lash Boost in May of 2017.  Prior to using Lash Boost, Plaintiff Buckingham was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She did not have a history of styes, nor was she prone to dry eyes.

28.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

29.     Plaintiff Buckingham was also not aware that an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

30.     Had Plaintiff Buckingham been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

31.     Following use of Lash Boost, Plaintiff Buckingham experienced burning and stinging in her eyes.  She also experienced a red, itchy, flaking patch of skin on her eyelid that will not go away.

32.     **Plaintiff Bobbie Joe Huling** is a realtor and resident of Lake County, Florida.

33.     Plaintiff Huling purchased Lash Boost in May of 2017.

34.     Prior to using Lash Boost, Ms. Huling was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She did not have a history of styes, nor was she prone to dry eyes.

35.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting.

36.     Ms. Huling was also not aware than an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

37.     Had Ms. Huling been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

38.     After using Lash Boost, Ms. Huling experienced red and itchy eyes.  In the morning, her vision was blurry until she washed her face and put cold water on her eyes.  Ms. Huling noticed that she was blinking more following the use of Lash Boost.

39.     Ms. Huling also noticed that her eye color was changing after using Lash Boost.  Ms. Huling has blue eyes with a brighter blue ring on the outside.  The lighter blue inside iris color began to turn yellow.  After using Lash Boost for approximately two weeks and experiencing an adverse reaction, Ms. Huling stopped using the product.  After stopping use of Lash Boost, Ms. Huling's eyes

went back to normal.

40.     **Plaintiff Cynthia Whetsell** is a resident of Peoria County, Illinois.  She purchased Lash Boost in May 2017 from a consultant.

41.     Prior to using Lash Boost, Plaintiff Whetsell was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She was not prone to dry eyes or styes.

42.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

43.     Plaintiff Whetsell was also not aware that an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

44.     Had Plaintiff Whetsell been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

45.     Following her use of Lash Boost, Plaintiff Whetsell experienced burning and redness in her eyes.  She also developed a grey spot in her vision and had central serious retinopathy.  It took roughly six months for her vision to go back to normal after using Lash Boost.

46.     **Plaintiff Martha Merle** is a resident of Wellesley County, Massachusetts.

47.     Ms. Merle purchased Lash Boost in January 2018.

48.     Prior to using Lash Boost, Ms. Merle was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She did not have a

history of styes, nor was she prone to dry eyes.

49.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting.

50.     Ms. Merle was also not aware than an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

51.     Had Ms. Merle been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

52.     Ms. Merle used Lash Boost as directed from January 2018 through April 2018.  After using Lash Boost the skin above Ms. Merle's eyes became unusually dry and itchy.

53.     **Plaintiff Elaina Hufnagel** is a registered nurse and a resident of Suffolk County, New York.  She purchased Lash Boost in September of 2017.  Prior to using Lash Boost, Plaintiff Hufnagel was not pregnant or nursing.  She was not being treated for an eye-related disorder and was had just ended her chemotherapy treatment.  She did not have a history of styes, nor was she prone to dry eyes.

54.     Plaintiff Hufnagel used Lash Boost for approximately three weeks in late October, early November of 2017.

55.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i)

increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

56.     Plaintiff Hufnagel was also not aware that an ingredient in Lash Boost was previously classified by the FDA as a category C pregnancy drug.

57.     Had Plaintiff Hufnagel been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

58.     Following use of Lash Boost, Plaintiff Hufnagel experienced eye irritation, swelling, burning, redness, itching, and crusting over of her eyes.  The skin around her eyes appeared darker than before using Lash Boost and her eyes were puffier than normal.  Following use of Lash Boost, Plaintiff Hufnagel saw both a dermatologist and an ophthalmologist to address the eye irritation she experienced after using Lash Boost.  She also experienced excessive tearing for over two months that added to the irritation and pain around her eyes.

59.     **Plaintiff Teresa Gattuso** is a resident of Suffolk County, New York.  She purchased Lash Boost in June of 2017 and used it for approximately eight weeks in the summer of 2017.  Prior to using Lash Boost, Plaintiff Gattuso was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She did not have a history of styes, nor was she prone to dry eyes.

60.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

61.    Had Plaintiff Gattuso been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

62.    Following the use of Lash Boost, Ms. Gattuso experienced eye pain, unusual tearing, lid crusting, and blurry vision.  Her eye lids were more red than normal and some of her eyelashes fell out following use of Lash Boost.  Although some of her lashes have grown back, they have not been restored to what they were like before her use of Lash Boost.

63.    **Plaintiff Elissa Wagner** is a resident of Suffolk County, New York.  Plaintiff Wagner purchased Lash Boost in September 2017, and previously received a tube as a gift in the summer of 2016.  Prior to using Lash Boost, Plaintiff Wagner was not pregnant or nursing.  She was not being treated for an eye-related disorder and was not undergoing cancer treatment.  She did not have a history of styes, nor was she prone to dry eyes.

64.    Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

65.    Had Ms. Wagner been aware of these possible side effects before purchasing Lash Boost, she would not have purchased the product.

66.    Following her use of Lash Boost, Ms. Wagner experienced burning eyes, irritations, and white discharge in her eyes in the morning.

67.    **Plaintiff Dixie Williams** is a resident of Pierce County, Washington.  Plaintiff Williams purchased Lash Boost in May 2017 from a consultant.  Prior to using Lash Boost, Plaintiff Williams

was not pregnant or nursing.  She was not being treated for an eye-related disorder.  Ms. Williams was a cancer survivor and had ended her radiation treatment four years prior.  She did not have a history of styes.

68.     Before using Lash Boost, she was not aware that Lash Boost could have any of the following side effects (a) cause droopy eyelids by causing the loss of periorbital fat; (b) cause redness in the eyes by creating excess of blood in the eye vessels; (c) change the iris color; (d) darken the eyelid skin; (e) impact vision; (f) cause cysts or styes; (g) cause inflammation of the iris; (h) reactivate herpes simplex keratitis, which can result in inflammation and possible scaring of the cornea; (i) increase the prominence of lid vessels; and/or (j) cause eye pain, excessive tearing, and lid crusting (or other hypersensitivity reactions including red, itchy, flaky, skin).

69.     Had Plaintiff Williams been aware of these possible side effects before purchasing Lash Boost, she would not have purchased or used the product.

70.     Following the use of Lash Boost, Ms. Williams experienced burning, itching, and watery eyes.  She developed a rash on her eyelid and her eyelid became discolored and darkened.  She also developed a bump on her eyelid and lashes no longer grow where the bump is located.

**B.     Defendant**

71.     Rodan + Fields is headquartered in San Francisco, California.[20]  Before May 1, 2018, Rodan + Fields was a California LLC.  On or about May 1, 2018, it converted to a Delaware LLC.  On information and belief, Rodan + Fields' members are all residents of California.

72.     Rodan + Fields markets itself as a company that sells skincare and cosmetic products.  Rodan + Fields regularly conducts business in the State of California, including the sale of Lash Boost.  Lash Boost is distributed and marketed throughout the United States, including the states of California,

---

[20] S&P Global Market Intelligence, *Company Overview of Rodan & Fields, LLC*, Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=6324492 (last visited Aug. 7, 2018).

Florida, Illinois, Massachusetts, New York and, Washington.  It is sold online and through consultants.

Lash Boost is the same product—with the same omissions from its label—throughout the United

States.

73.    Rodan + Fields was founded by dermatologists Katie Rodan and Kathy Fields.  In 2002

Drs. Fields and Rodan created the acne treatment Proactiv.  The prior company was acquired by Estee

Lauder in 2003.  In 2007, Drs. Fields and Rodan bought back the company and converted from selling

its products in department stores to utilizing consultants to sell products.

74.    In 2009, the business changed to a multilevel marketing program (the same kind of

marketing used by companies such as Avon, Mary Kay, and Amway).  Rodan + Fields sells Lash

Boost via independent contractors, using a marketing strategy that encourages them to market the

product through social media.[21]

## JURISDICTION AND VENUE

75.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d).  One or

more of the Plaintiffs and putative class members is a citizen of a different state from Defendant.

Furthermore, the aggregate amount in controversy exceeds $5,000,000.

76.    This Court also has original subject matter jurisdiction over this action under 28 U.S.C.

§ 1331 (federal question) and 18 U.S.C. § 1964 (RICO).

77.    In addition, the Court has supplemental jurisdiction over Plaintiffs' state law claims

under 28 U.S.C. § 1367.

78.    This Court has personal jurisdiction over Rodan + Fields because Rodan + Fields is

headquartered in the Northern District of California and Rodan + Fields has directed its marketing and

sales of numerous products from its headquarters in the Northern District of California.  Rodan +

Fields has substantial contacts with the State of California such that maintenance of the action is

---

[21] Castillo, *How Rodan + Fields bought back their skincare company and topped $1 billion in sales supra* note 18.

1  consistent with traditional notions of fair play and substantial justice.

2       79.    Further, Rodan + Fields has transacted business, maintained substantial contacts, and/or

3  committed overt acts throughout California, Florida, Illinois, Massachusetts, New York, Washington,

4  and the United States.  The acts have been directed at, and have had the intended effect of, causing

5  injury to persons residing in, located in, or doing business throughout the United States including

6  California, Florida, Illinois, Massachusetts, New York, and Washington, including in this District.

7       80.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b).  A substantial

8  portion of the events giving rise to the claims alleged in this Complaint took place within the Northern

9  District of California.

### III.    FACTUAL BACKGROUND

**A.    The Problematic Ingredient in Lash Boost**

      81.    In contrast to prescription drugs, cosmetics may be marketed in the United States

without FDA approval.

      82.    This means that products that contain the same ingredients as drugs may be able to

evade FDA review and regulation by being classified as cosmetics.  This, however, does not absolve

Rodan + Fields from liability for failing to disclose to consumers the adverse side effects associated

with their product.  Rodan + Fields is still required to comply with federal laws, state consumer

protection laws and applicable state laws relating to fraud, as explained in further detail below.

      83.    "[I]sopropyl cloprostenate is a synthetic prostaglandin analog in the same class of

compounds as the active ingredient in FDA-approved drugs indicated to lower intraocular pressure in

glaucoma patients."[22]  The FDA has previously warned manufacturers marketing eyelash growth

serums that were promoted for the growth of eyelashes using the same ingredient, isopropyl

cloprostenate, that these products violated the Food, Drug, and Cosmetic Act because they were

---

[22] Cruse, *Warning Letter, supra* note 10.

unapproved new drugs and misbranded drugs.[23]  The FDA also noted the harmful side effects associated with prostaglandin analogs: "[o]ther potential adverse events associated with prostaglandin analogs for ophthalmic use include ocular irritation, hyperemia, iris color change, macular edema, ocular inflammation, and interference with glaucoma therapy.  In addition, prostaglandin analogs for ophthalmic use are currently classified as Pregnancy Class C."[24]

84.     Drugs are classified as Pregnancy Category C when either: (1) animal reproduction studies have shown an adverse effect on the fetus and there are no adequate and well controlled studies in humans, but potential benefits may warrant use of the drug in pregnant women despite potential risks; or (2) there are no animal reproduction studies and no adequate and well controlled studies in humans.

85.     Rodan + Fields does not disclose the majority of risks of isopropyl cloprostenate, or its classification as a Category C drug, when marketing and distributing Lash Boost.

86.     Prostaglandin analogs are powerful agents available for the treatment of a variety of medical conditions.  Most notably, it is used as a topical agent to treat elevated intraocular pressure (IOP), or glaucoma.[25]  Glaucoma is a potentially blinding ocular disease.

87.     The first topical prescription prostaglandin analog, Xalatan® (latanaprost) was brought to market in 1996.[26]  The ocular side effects associated with prostaglandin analogs have been widely studied and reported in medical and scientific literature as a result.  The side effects of this class of

---

[23] *Id.*

[24] *Id.*

[25] Anne J. Lee, et al., *Clinical utility and differential effects of prostaglandin analogs in the management of raised interocular pressure and ocular hypertension*, NCBI (July 30, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2915861.

[26] Martha Snyder Taggart, *Success at Lash! Two New Glaucoma Drugs Reach the Market*, ("Xalatan™ (latanoprost, Pfizer), the first prostaglandan analog, was approved in 1996.") (published online March 29, 2018) https://www.brightfocus.org/glaucoma/news/success-at-last-two-new-glaucoma-drugs-reach-market; *See also* Xalatan® package insert. http://labeling.pfizer.com/ShowLabeling.aspx?id=613

chemical were well documented years before Lash Boost first entered the market in 2016.  For example, in 1999, an article titled "Prostaglandin Analogs in the Treatment of Glaucoma," originally published in the journal Seminars in Ophthalmology, described side effects of prostaglandin analogs including "mild conjunctiva I hyperemia and local irritation, darkening of the iris color, increased growth of eyelashes, and a possible association with cystoid macular edema."[27]  The same article was subsequently published online in 2009.

88.     While prostaglandin analogs can be used to treat high eye pressure and increase the length of eyelashes, they also have side effects, which can be serious:

- They can cause droopy eyelids by causing the loss of periorbital fat and the presence of ptosis;[28]

- They can cause redness in the eyes by creating an excess of blood in the eye vessels;

- They can change the color of the iris (iris hyperpigmentation);[29]

- They can cause darkening of the eyelid skin (periocular skin pigmentation);[30]

- They can impact vision including blurred vision;[31]

- They can cause (cystoid macular edema);[32]

---

[27] Thomas W. Hejkal & Carl B. Camras, *Prostaglandin Analogs in the Treatment of Glaucoma*, Seminars in Ophthalmology, (1999) (published online July 2, 2009), https://tandfonline.com/doi/abs/10.3109/08820539909061464

[28] Marianne Doran, *What Clinicians Need to Know About Prostaglandin Associated Periorbitopathy*, American Academy of Ophthalmology (March 2012), https://www.aao.org/eyenet/article/what-clinicians-need-to-know-about-prostaglandin-a.

[29] Dr. S. Deepthi DNB, Dr. S.J. Saikumar, MS, DNB, *Side Effects Associated with Prostaglandin Analogue Therapy*, Kerala Journal of Opthalmology (March 2014), ksos.in/ksosjournal/journalsub/Journal_Article_33_545.pdf

[30] *Id.*

[31] *Which Medicines Treat Glaucoma*, https://www.webmd.com/eye-health/which-medicines-treat-glaucoma#1 (Side effects of prostaglandin analogs include "[c]hanges in eye color or eyelid skin, *blurred vision*, stinging, redness, itching") (emphasis added).

[32] Deepthi, *Side Effects Associated with Prostaglandin Analogue Therapy, supra* note 29.

- They can cause cysts;[33]

- They can cause inflammation of the iris or ciliary body;[34]

- They can reactivate herpes simplex keratitis[35,36] which can result in inflammation and possible scarring of the cornea;

- They can increase the prominence of lid vessels;[37]

- They can cause "burning, stinging, foreign body sensation (something in the eye), blurred vision, and itching;"[38]

- They can cause eye pain, excessive tearing, and lid crusting (conjunctival hyperemia);[39] and they can lengthen eyelashes.[40]

89.   Multiple peer-reviewed papers, as well as widely distributed trade journals, report complications and side effects associated with the use of topical prostaglandins for glaucoma,[41]

---

[33] *Id. See also*, I C Lai, M T Kuo, and L M C Teng, *Iris pigment epithelial cyst induced by topical administration of latanoprost*, (March 2003), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1771569/.

[34] Deepthi, *Side Effects Associated with Prostaglandin Analogue Therapy, supra* note 29.

[35] *Id.*

[36] Smith, PharmD,BCPS, *Medication Review: Prostaglandin Analogs for Glaucoma, supra* note 5 "("Other ocular side effects include foreign body sensation, ocular pruritus, decrease in vision, reactivation of uveitis, herpes infection of the cornea, bacterial keratitis, and swelling of the retina (macular edema). Non-ocular adverse reactions that have been reported include exacerbation of asthma, headache, common cold, cough, muscle/joint pain, and urinary tract infection (UTI)").

[37] Berke, MD, *PAP: New Concerns for Prostaglandin Use, supra* note 3.

[38] Dahl, MD, FACS, *Glaucoma Medications, supra* note 7.

[39] *Id.*

[40] Smith, PharmD, BCPS, *Medication Review: Prostaglandin Analogs for Glaucoma, supra* note 5 ("One common side effect [of prostaglandin analogs] is changes in eyelash and vellus hair (fine, barely noticeable hairs). These changes include increase in length, thickness, pigmentation, and number. Rarely, fine hair can grow on the eyelid skin or corner of the eye.")

[41] Lisa Young, *"Exposure Keratopathy Secondary to Prostaglandin Associated Periorbitopathy."* American Academy of Optometry, (2013), https://www.aaopt.org/detail/knowledge-base-article/exposure-keratopathy-secondary-prostaglandin-associated-periorbitopathy ("Prostaglandin analogues are used in the treatment and management of glaucoma by increasing aqueous outflow via the uveoscleral pathway. Common known side effects of these drugs include increased pigmentation of irides and lashes, hypertrichiasis, blurred vision and conjunctival hyperemia. Periorbitopathy is a more recently documented side effect that has been noted with an absence of dermatochalasis, levator dehiscence, ptosis of upper lid, decreased prominence of orbital fat pads and relative enophthalmos.").

1   including skin hyperpigmentation, irritation, and increased eyelash thickness and pigmentation,[42]

2   Meibomian gland dysfunction (MGD),[43] and orbital fat atrophy.[44]

3   90.     There is also an established medical literature finding human body-wide complications

4   associated with prostaglandin analog use.[45]

5   91.     Prostaglandin analogs' ocular side effects include those that can interfere with vision.[46]

6   Exposure to prostaglandin analogs affects the metabolism of periorbital cells, causing them to shrink.

7   "The shrinkage of fat cells surrounding the eye causes enophthalmos—the eye becomes more sunken-

8   in.  The result is a deepening of the superior eye lid sulcus, which periorbital fat tissue seems to melt

9   away."[47]   The change "is actually quite striking."  Dr. Stanley Burke wrote, "[t]he bottom line here is

10  that . . . this effect is real, it's common, and *it's associated with all the drugs in the class*."[48]  These

11  side effects are thus necessarily associated with isopropyl cloprostenate.

12  92.     The risk of the adverse side effects of prostaglandin analogs is low relative to the utility

---

[42] Ta Chen Peter Chang, MD, Sharon Freedman, MD *Glaucoma Medications*, American Academy of Ophthalmology, (November 6, 2015), https://www.aao.org/disease-review/glaucoma-medications

[43] Lee TH, Sung MS, Heo H, and Park SW, "Association between meibomian gland dysfunction and compliance of topical prostaglandin analogs in patients with normal tension glaucoma." U.S. National Library of Medicine National Institutes of Health, PubMed.gov, (January 31, 2018), https://www.ncbi.nlm.nih.gov/pubmed/29385185 (finding "malfunction of the meibomian glands can be an important clinical finding associated with compliance of PGA [prostaglandin analog] monotherapy in patients with NTG [normal tension glaucoma].")

[44] Chang, MD, *Glaucoma Medications, supra* note 42.

[45] E.Roy Pettipher, Encylopedia of Immunology (Second Edition, 1998), "Pathways of prostaglandin formation." https://www.sciencedirect.com/topics/agricultural-and-biological-sciences/prostaglandin; *See also*, Richard Jones PhD, Kristin H. Lopez PhD, in Human Reproductive Biology (Fourth Edition), 2014, "The History and Ethics of Induced Abortion." *Id.* ("Prostaglandin injections were introduced in 1970 as a method for second trimester abortions and are widely used outside of the United States at this stage of pregnancy, either alone or in combination with mifepristone (RU-486). These drugs work best from the 15th to the 20th week of second trimester pregnancy. The prostaglandins can be injected into the amniotic fluid or between the fetal membrane and the uterine wall, or administered as a vaginal suppository or dissolved in the mouth.").

[46] Mass. Eye and Ear Infirmary, *Glaucoma drug can cause droopy eyelids,* Science Daily (May 21, 2013), https://www.sciencedaily.com/releases/2013/05/130521121505.htm.

[47] Berke, MD, *PAP: New Concerns for Prostaglandin Use*, *supra* note 3.

[48] *Id.  (emphasis added).*

of preventing and treating a disease, like glaucoma, that, if untreated, could result in blindness. The same cannot be said for someone using a product to lengthen and improve the appearance of eyelashes. It is therefore imperative that consumers are warned of the potentially vision impairing, painful, and permanent consequences associated with Lash Boost's use. Otherwise, they cannot intelligently weigh the risks and benefits for themselves.

**B.    FDA-Approved Eye Lash Growth Products Using Prostaglandin Analogs Warn of Known Side Effects**

93.    Once it was discovered that prostaglandin analogs used to treat glaucoma had the effect of lengthening eyelashes, they were marketed for purposes other than glaucoma treatment and used in prescription medications to lengthen eyelashes.

94.    On December 24, 2008, the FDA approved Latisse as a topical serum and treatment for hypotrichosis of the eyelashes (sparse eyelashes).[49] The active ingredient in Latisse is bimatropose, a prostaglandin analog.

95.    When consumers purchase Latisse, the product comes with FDA-approved patient labeling. The product itself comes with an extensive package insert that provides warnings and precautions, instructions on indications and use, and lists the most frequently reported adverse reactions.

96.    The Latisse warnings and precautions advise of effects on: intraocular pressure, iris pigmentation changes, lid pigmentation, hair growth outside the treatment area, intraocular inflammation, and macular edema.

97.    The Latisse product insert also lists post-marketing experiences, i.e. side effects of the drug discovered after its approval process. The listed reactions that have been identified during post marketing use of Latisse in clinical practice include: eye swelling, eyelid edema, hypersensitivity

---

[49] *Drug Approval Package: Latisse,* U.S. Food & Drug Administration (Aug. 27, 2009), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/022369_latisse_toc.cfm.

(local allergic reactions), lacrimation increased, madarosis and trichorrhexis (temporary loss of a few lashes to loss of sections of eyelashes, and temporary eyelash breakage, respectively), periorbital and lid changes associated with a deepening of the eyelid sulcus, rash (including macular and erythematous), skin discoloration (periorbital), and vision blurred.

98.     The Latisse product insert also cautions that the product is classified as a Pregnancy Category C drug and warns nursing mothers about its use.  When unfolded, the insert itself is approximately 14 by 22 inches.  Notably, the Latisse website lists side effects of using the product including a warning that the product "may cause brown darkening of the colored part of the eye which is likely permanent.  LATISSE® may cause eyelid skin darkening which may be reversible. . . . Common side effects include itchy and red eyes."[50]

99.     By contrast, Lash Boost does not come with similarly extensive product warnings that clearly instruct consumers on all of the serious side effects associated with the product, including potentially permanent side effects such as iris pigmentation changes.

100.     The disclosures that accompany the Lash Boost Product are a short set of warnings in small print on the outside of the cylindrical container, and again as part of a small insert (approximately 5½ by 3 inches) inside the tube, along with instructions on how to apply the product, and an ingredient list.  Indeed, the list of ingredients in the insert is longer than the warnings provided to consumers.

---

[50]*Latisse (bimatoprost ophthalmic solution) 0.03% Important Information*, Latisse, http://www.latisse.com/ (last visited Aug. 7, 2018).

Eyelash Conditioning Serum | 5 mL/0.17 Fl. Oz.

**DIRECTIONS**

ENHANCEMENTS Lash Boost™ should be used nightly along the upper lashline.

1. Wash your face before applying Lash Boost. Eyes should be completely clean and dry. Do not use any leave-on products underneath Lash Boost, including eye cream.

2. Apply Lash Boost along the upper lashline of your left and right eyes. Dip the brush in the product only once per eye and wipe off any excess product from the brush before applying.

3. Product should only be on the lashline. Gently wipe off any excess product from your eyelid or lashes.

4. Wait approximately 90 seconds until product has dried before going to sleep or applying additional products around the eye area. Do not wash your face or eyes after applying.

If you get product in your eye, rinse with water. For some, a mild tingling sensation may occur upon application. It should improve within a few minutes and disappear completely with continuous use. Discontinue use if tingling, irritation and/or redness persists.

Continue to use nightly after desired results are achieved to maintain lash condition.

**WARNINGS**

**For external use only.** Avoid getting in the eye; in the event of direct contact rinse with cool water. If you develop irritation or swelling, discontinue product usage. If irritation is significant or in the first instance of any swelling, consult your physician. If you're pregnant or nursing, being treated for any eye-related disorder, undergoing cancer treatment, prone to dry eyes or styes, consult your physician before use. If you notice irregularities in appearance of lashes over time, discontinue use. Keep out of reach of children.

**INGREDIENTS**

Water, Butylene Glycol, Hydroxyethylcellulose, Keratin, Hydrolyzed Keratin, Biotin, Sodium Hyaluronate, Isopropyl Cloprostenate, Octapeptide-2, Allantoin, Panthenol, Copper Tripeptide-1, Pantethine, Polypeptide-23, Cucurbita Pepo (Pumpkin) Seed Extract, Glycerin, Sea Water, Malus Domestica Fruit Cell Culture Extract, Hydrolyzed Glycosaminoglycans, Prunus Amygdalus Dulcis (Sweet Almond) Fruit Extract, Backhousia Citriodora Leaf Oil, Dipotassium Glycyrrhizate, Rhizobian Gum, Styrene/Acrylates/Ammonium Methacrylate Copolymer, Xanthan Gum, PVP, Lecithin, PEG-12 Dimethicone, Alcohol denat, Chlorphenesin, Phenoxyethanol, Sorbic Acid, Sodium Hydroxide

101.     The information accompanying the product contained inadequate statements about facts material to the transaction; namely, the warnings failed to include the serious adverse side effects associated with the prostaglandin analog in Lash Boost.

102.     While Rodan + Fields does provide the "Lash Boost Frequently Asked Questions" fact sheet to its consultants, and is available online, that document does not disclose all of the side effects associated with prostaglandin analogs.  The materials provided to consultants who sell Lash Boost, the

Rodan + Fields website, and the product labeling all suffer from the same material omissions.

**C.      A Prior California Legal Action Involved Another Lash Serum Company Also Using A Prostaglandin Analog**

103.      The maker of Latisse previously filed suit against another company that marketed a lash serum with a prostaglandin analog.  The immediate predecessor product contained isopropyl cloprostenate, the same ingredient used in Lash Boost.  The complaint alleged that the petitioner violated the California Unfair Competition Law.  The manufacturer of Latisse alleged "that, by selling a competing drug without requiring a prescription and without an approved new-drug application, petitioner caused respondent to lose sales and suffer other financial injuries."[51]  The Federal Circuit held that the claim was not preempted, concluding that Latisse's claim did not intrude upon the FDA's discretionary authority to enforce the FDCA.  Certiorari was sought, but after the Solicitor General submitted an amicus brief agreeing with the Federal Circuit and arguing that review was not warranted, the Supreme Court denied the petition.  The court entered a permanent injunction prohibiting the sale of the product in California.

**D.      Rodan + Fields, Through Its Material Omissions, Misled Consumers Throughout the United States About the Serious Side Effects of Lash Boost**

104.      As discussed throughout this complaint, Lash Boost's label contains material omissions.

105.      Since the debut of Lash Boost on the market, Defendant has omitted material information on the product's labeling, which materially omits the existence of adverse side effects associated with prostaglandin analogs, including isopropyl cloprostenate, and materially omits the nature, extent, and duration for some of these side effects.

106.      The label on the product packaging previously read: "WARNINGS: For external use only.  Avoid getting in the eye; in the event of direct contact, rinse with cool water.  If irritation

---

[51] Brief for the United States as Amicus Curiae at 5-6, *Athena Cosmetics, Inc. v. Allergan, Inc.*, No. 13-1379 (May 2015), http://sblog.s3.amazonaws.com/wp-content/uploads/2015/06/13-1379-Athena-US-amicus.pdf.

persists, consult your physician.  Consult with your physician if you're pregnant or nursing, being

treated for any eye-related disorder, or actively undergoing cancer treatment.  Keep out of reach of

children."

107.    Below is a photograph of a Lash Boost purchased in 2018.  As the photo below shows,

the label now reads: "WARNINGS For external use only.  Avoid getting in the eye; in the event of

direct contact rinse with cool water.  If you develop irritation or swelling, discontinue product usage.

If irritation is significant or in the first instance of any swelling, consult your physician.  If you're

pregnant or nursing, being treated for any eye-related disorder, undergoing cancer treatment, prone to

dry eyes or styes, consult your physician before use.  If you notice irregularities in appearance of

lashes over time, discontinue use.  Keep out of reach of children."



108.    On information and belief, the new warning label was updated on or about February

2018.

109.    Because Lash Boost came in packaging that contained one or another of the previously

discussed warnings, all Class Members were exposed to one or another of these two warnings.

110.    Although Rodan + Fields updated its warning label, the new label, like the old one, does

not adequately disclose and warn of adverse effects associated with Lash Boost.

111.    Advising someone to consult with their physician if pregnant is different than advising

them that this product puts women of childbearing age at risk of injury.[52]  The purpose of a warning

label is to advise consumers of potential adverse side effects before they occur.  Advising consumers to

---

[52] Cruse, *Warning Letter*, *supra* note 10.

discontinue use if they "notice irregularities" does not provide consumers with the information to make an informed decision before they experience an adverse side effect.

112.    Notably, although the side effects of prostaglandin analogs are widely known among eye doctors, prostaglandin analogs have many different names.[53]  Even if a consumer were to consult a doctor regarding the Lash Boost ingredient list prior to use, a doctor may not recognize isopropyl cloprostenate as a prostaglandin analog.  It is all the more important that Rodan + Fields advise consumers of the side effects associated with the product.

113.    Lash Boost's warning label, as it existed in 2016 until the present, is deceptive, misleading, and unlawful.  It fails to warn individuals of adverse side effects associated with prostaglandin analogs.  A reasonable consumer reading this warning would gain very little meaningful information about the actual severity and duration of any adverse side effects, and would reasonably conclude that the product was safe and non-irritating.

114.    Consumers are entitled to make knowing and intelligent decisions about the products they purchase.  Rodan + Fields' material omissions are deceptive marketing practices designed to derive profits and revenues from unknowing consumers.

115.    Rodan + Fields' failure to properly label Lash Boost has deprived Plaintiffs and all consumers of the information they needed, and deserved, to make an informed decision about whether to purchase Lash Boost.

116.    If Rodan + Fields fully disclosed adverse side effects of Lash Boost, Plaintiffs would have decided not to purchase Lash Boost.

---

[53] *See, e.g.* Fine Chemical Application Development Corporation (FCAD) https://www.fcad.com/mdn-an-effective-bimatoprost-replacement-on-lengtenhing-eyelashes/ (Methylamido Dihydro Noralfaprostal (MDN) is also a prostaglandin); *see also* Jeffrey M. Joseph MD, *Lashes After Latisse*, Millenial Eye, (July/August 2017), https://millennialeye.com/articles/2017-jul-aug/lashes-after-latisse/ ("Other prostaglandin analogues used in lash products include dechloro dehydroxy difluoro ethylcloprostenolamide and methylamido dihydro noralfaprostal.").

117.     Plaintiffs lost money as a result of Rodan + Fields' omissions, in that they did not receive what they paid for when purchasing Lash Boost.  Additionally, Plaintiffs altered their positions to their detriment and suffered economic damages.

118.     In addition, Rodan + Fields also did not fully and adequately advise their consultants about the adverse effects associated with Lash Boost.  Consultants who sold the products to consumers were not advised during their training of all the adverse side effects associated with Lash Boost.

119.     "Fields and Rodan are quick to say they are doctors, not businesswomen."[54]  Rodan + Fields touted their status as doctors to distinguish their company from other cosmetic manufacturers.

120.     Rodan + Fields could have advised consultants, updated their website, included new packaging materials, or modified their product label to advise Plaintiffs of the adverse effects.  Yet they did nothing to disclose the risks of serious side effects.  Indeed, as discussed next, Rodan + Fields continued to utilize the Enterprise in furtherance of their scheme to defraud by issuing false and misleading messages vouching for the safety of the product, even as their own customers continued to report symptoms and injuries that further demonstrated these risks.

**E.     Misrepresentations on the Rodan + Fields Website and in Marketing Materials**

121.     While Plaintiffs relied on Rodan + Fields' omissions, Rodan + Fields also issued affirmative misrepresentations about Lash Boost.  These misrepresentations are discussed because they help to show Rodan + Fields' state of mind, among other issues.

122.     Rodan + Fields markets its Lash Boost serum as clinically shown to enhance the appearance of eyelash volume and length.  Rodan + Fields uses the ingredient isopropyl cloprostenate and makes claims such as: "get the appearance of lush, longer-looking lashes…. Our eye-lash conditioning serum is clinically shown to enhance the appearance of eyelash volume and length."  It

---

[54] Kate Vinton, *How Two Dermatologists Built a Billion Dollar Brand In Their Spare Time*, Forbes (June 1, 2016), https://www.forbes.com/sites/katevinton/2016/06/01/billion-dollar-brand-proactiv-rodan-fields/#3c6d892c3bfe.

also claims, however, that Lash Boost "will not affect the structure or function of your lashes."

123.    Like other prostaglandin analogs, Lash Boost can cause adverse side effects.  Users who have purchased and used Lash Boost have experienced side effects including, among others, change in iris color, eyelid drooping, itchy eyes, eye discoloration, thinning eyelashes/loss of eyelash hair, eye sensitivity, cysts, and vision impairment.

124.    Rodan + Fields' website mischaracterizes the existence of these adverse side effects.[55]

125.    As demonstrated by the company's description of the most common consumer complaints associated with the use of Lash Boost, Defendant fails to warn of the nature and extent of the adverse side effects:



What are the most common consumer complaints you anticipate from use of ENHANCEMENTS Lash Boost?

The finished product and the ingredients contained in ENHANCEMENTS Lash Boost have been thoroughly tested in Clinical and Consumer Studies. As with most cosmetic products, some consumers may report temporary tingling or redness, which normally disappears after continued use. *However, if any tingling, itching or redness persists or is not tolerable, discontinue use and seek medical advice.*

[56]

126.    This is misleading because it does not disclose that some consumers experience side effects that can be permanent and more severe than those described.

127.    Defendant also claims the product has been "thoroughly tested," yet its website describes only one "consumer study" of Lash Boost, with only 41 participants that lasted just eight weeks.[57]  Contrarily, FDA preapproval studies involve "several hundred to several thousand

---

[55] *What are the most common consumer complaints you anticipate from use of ENHANCEMENTS Lash Boost?*, Rodan + Fields, http://www.rodanandfields.com/rfconnection/index.php/2017/06/26/what-are-the-most-common-consumer-complaints-you-anticipate-from-use-of-enhancements-lash-boost/ (last visited Aug 7, 2018).

[56] *Id.*

[57] 2016 Frequently Asked Questions, Rodan + Fields ENHANCEMENTS Lash Boost™ Updated on 12/22/2016.

1    patients."[58]

2        128.    Rodan + Fields appeals to their customers, as the following advertisement shows,

3    asking "what if you had the lashes you long for?" but fails to disclose the serious risks associated with

4    using Lash Boost in order to realize that desire:



5

6

7

8

9

10

11

12

13

14

15

16

17

18

19        129.    When using prostaglandin analogs for their original purpose—to treat glaucoma—the

20    consumer must weigh the known side effects, including possible eye color change, droopy eyelids, and

21    eyelid skin darkening, against the prospect of total blindness resulting from glaucoma.  When using

22    prostaglandin analogs to get the "lashes you long for," the consumer should be able to weigh those

23    same known side effects against the prospect of their eyelashes appearing longer.  Rodan + Fields does

24    not afford their Lash Boost customers that opportunity.

25

26

27    _____
      [58] "Postmarketing Surveillance Programs."
28        https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/ucm090385.htm

130.    For example, the Rodan + Fields website contrasts the existence of serious side effects associated with *other* lash products used to improve lashes.  The website reads: Question: "I have heard about side effects caused by drugs and other products used to improve lashes.  Should I be concerned about potential side effects from the use of Enhancements Lash Boost?"  Answer: "No.  The only serious side effects we have heard about are those associated with drug products, not cosmetics.  ENHANCEMENTS Lash Boost is a cosmetic."[59]  The response provided by Rodan + Field fails to disclose that like the products it references, Lash Boost also contains a prostaglandin analog with the same associated risks.

131.    Information available to consumers elsewhere on Rodan + Fields' website advised consumers to consult a doctor: "if anyone has a health concern or is hesitant about using ENHANCEMENTS Lash Boost, they may review the ingredient list with their doctor and utilize the patch test prior to use."[60]  Advising a consumer to consult a doctor before use, however, does not absolve Rodan + Fields of the responsibility to advise consumers of the serious risks associated with use, especially when the product is marketed as a cosmetic that does not require a prescription.

132.    Defendant's marketing of Lash Boost and failure to warn individuals of the harmful adverse effects caused Plaintiffs to purchase and use Lash Boost.  Rodan + Fields continued to market its product in a misleading fashion even after its own customers complained of adverse product reactions.

133.    On its website, Rodan + Fields also specifically said, "[i]t is not a drug product and will not affect the structure and function of your lashes" and that "Lash Boost is clinically and

---

[59] US General FAQs, Rodan + Fields, *supra* note 14.
[60] 2017 Frequently Asked Questions, Rodan + Fields ENHANCEMENTS Lash Boost™ Updated on 7/31/2017, http://www.rodanandfields.com/images/archives/ENHANCEMENTS_Lash_Boost_FAQs.pdf

ophthalmologist tested, and found to be safe and non-irritating."[61]  This is misleading and deceptive. Particularly when Rodan + Fields passed themselves off as a source of trusted information, a company started by two doctors, with the "philosophy to create safe and effective formulations, and thus, would not place a product on the market otherwise."[62]  Yet the only "test" specified on the Rodan + Fields website was a "consumer" study involving only 41 people that lasted only eight weeks.  And despite its purported philosophy to create safe and effective formulations, Defendant manufactured Lash Boost using a synthetic prostaglandin analog that was well known to pose potentially severe and permanent injury, without disclosing such risks.  In reality, Defendant would—and did—place a product on the market that was not safe.  Moreover, it has continued to market that product for more than two years despite the real-world experiences of its customers that demonstrated it was not safe.

---

For questions pertaining to any potential adverse effects associated with using ENHANCEMENTS Lash Boost

Rodan + Fields' philosophy is to create safe and effective formulations, and thus, would not place a product on the market otherwise. ENHANCEMENTS Lash Boost is clinically and ophthalmologist tested, and found to be safe and non-irritating. It is a nightly lash conditioning serum that is intended to moisturize, nourish and protect your lashes. ENHANCEMENTS Lash Boost is a cosmetic-grade product designed to improve the appearance of your lashes. It is not a drug product and will not affect the structure and function of your lashes. For best results, apply ENHANCEMENTS Lash Boost to the lash or brow line. If you have health or medical concerns, confer with your doctor. And if you do experience some adverse effects, please discontinue use and seek medical advice.

---

134.     Moreover, the statement that Lash Boost "will not affect the structure or function of your lashes"[63] is false, given the established fact that prostaglandin analogs have an effect on the structure or function of the body, and is also inconsistent with Rodan + Fields' claims that Lash Boost will improve the *appearance* of eyelashes, when prostaglandin analogs actually can make your lashes grow.  The fact that prostaglandin analogs have an effect on the structure or function of the body has been medically established.  The website also says that the product is "intended to moisturize, nourish,

---

[61] US General FAQs, Rodan + Fields, *supra* note 14.
[62] *Id.*
[63] *Id.*

and protect your lashes."[64]

135.    The website also represents that the product was "found to be safe and non-irritating."[65] This statement ignores both the prevailing science and actual user experiences.

136.    In addition, advising consumers to stop using a product if adverse side effects appear is not the same as warning them of the nature, extent, and duration of side effects *before they use it*. Defendant knew, or should have known, when their product was tested by an ophthalmologist, and based on overwhelming medical and scientific research, as well as user experience that the prostaglandin analog ingredient in Lash Boost could cause serious adverse effects and physical injury to patients using it, and had a duty to disclose this risk.  The statement that the product was "found to be safe and non-irritating" is inadequate, misleading, and made for the purpose of misleading the public.

137.    Rodan + Fields also makes the affirmative statement that "Lash Boost does not cause discoloration or change in pigmentation of the iris."[66]  This statement contradicts both the reported experiences of many Lash Boost users and the vast amount of publicly available research that prostaglandin analogs may cause changes in eye color.

138.    Thus, the adverse side effects that Plaintiffs experienced were not adequately disclosed, and instead Rodan + Fields made affirmative misrepresentations about Lash Boost.

**F.    Online Consumer Complaints About Lash Boost Are Prolific**

139.    Upset consumers who used Lash Boost and were not warned about the adverse side effects before purchasing and/or using it have become more vocal about their negative experiences with this product.

140.    A sampling of Lash Boost Consumer Reviews and Complaints reveals symptoms and

---

[64] *Id.*
[65] *Id.*
[66] 2016 Frequently Asked Questions, Rodan + Fields ENHANCEMENTS Lash Boost™, *supra* note 54.

experiences consistent with the known side effects of prostaglandin analogs:

### Rodan and fields lash boost

Jan 24

Used this product for one month.Had slight eye itchiness but tried to "deal with it" to see the results. Well a month in and my left eye will NOT stop tearing. Terrible !There is something dangerous in this product!

Read more ›

> AN   **Molly**
> I completely agree. I used it ONCE 68 hours ago. Both of my eyes are still extremely red, itchy and puffy. I'm extremely disappointed and frustrated.

> AN   **Beth**
> I AGree!! Aweful redness scratchy eyes. Not safe people look at the ingredients

[67]

### Rodan and Fields - Works but if you stop using lashes fall out.

Jan 21

Using R and F was good while using it.Shortly after I stopped, I noticed that my lashes were falling out at a rapid rate. I now have far less lashes than I started with. Really a shame.Cannot recommend.

Read more ›

> AN   **Rocg**
> The prostaglandin masculinizes your hair follicles.Elsewher, it triggers different reactions.

> AN   **Anna**
> I think I am experiencing that now with the Lash Boost. I noticed my eyelids and under eye area getting way way darker. I also started getting headaches and discomfort behind...

[68]

### Rodan and Fields - HELP

Jan 18

I posted a previous review stating that my eyelids have been swollen for two-plus weeks after using the **Lash boost** ONE time. Somebody please tell me how I can get the swelling on my eyelids to go down. .

Read more ›

[69]

---

[67] Anonymous, Comment to *Rodan And Fields Lash Boost Serum Reviews and Complaints,* Rodan + FieldsRodan + Fields (Jan. 24, 2018), https://rodan-and-fields.pissedconsumer.com/rodan-and-fields-lash-boost-serum-37045/RT-C.html (last visited Aug. 13, 2018).

[68] *Id.*

[69] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



70



71





72

141.   Despite numerous consumer reviews and complaints on the internet, and complaints

from individual consumers to Rodan + Fields reporting negative side effects associated with Lash

---

70 *Id.*
71 *Id.*
72 *Id.*

Boost, Rodan + Fields persists in its deceptive marketing and fraudulent scheme while unknowing consumers continue to purchase the product and face the risk of potentially serious consequences including: vision impairment, change of eye color, cysts, drooping eyelids, eye discoloration, and extreme irritation, as these examples describe.

142.   Even if Rodan + Fields were to claim that they were unaware of these side effects when they launched Lash Boost, which is not plausible given the above facts and circumstances, they had a duty to continue to warn consumers of post-marketing use in practice.  Rather than updating their warnings, Rodan + Fields persisted in their omissions, and persistently failed to advise the public of the serious side effects associated with Lash Boost use.

## IV.   CLASS ACTION ALLEGATIONS

143.   This matter is brought by Plaintiffs on behalf of themselves and those similarly situated.

144.   Plaintiffs seek certification of a nationwide class (the "Nationwide Class") under rule 23(b)(3) or in the alternative seek a Nationwide Issue Class under Rule 23(c)(4).

145.   In addition, Plaintiffs identify six state-specific classes (the "State Classes"), which pray for relief, including but not limited to, monetary damages under the consumer protection statutes of California, Florida, Illinois, Massachusetts, New York, and Washington.

146.   Plaintiffs reserve the right to modify or amend the class definitions at or before they move for class certification.

**Rule 23(b)(3) Nationwide Class**

147.   Plaintiffs seek certification under Rule 23(b)(3).  Plaintiffs bring this action on behalf of themselves and all others similarly situated, defined as follows:

All persons within the United States of America who purchased and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("Nationwide Class").

148.   Excluded from the Nationwide Class are Defendant; any entity in which Defendant has

a controlling interest; Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; the judicial officers and associated court staff assigned to this case, and the immediate family members of such officers and staff; and all persons who make a timely election to be excluded from the Class.

149.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

150.    Members of the class are so numerous and geographically dispersed that joinder of the individual members of the Class would be impracticable.  While the exact number of Nationwide Class Members is unknown, it can be ascertained through Defendant's records.  Plaintiff believes that Lash Boost has been purchased by tens of thousands of individuals across the nation.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

151.    Questions of law and fact are common within the Class and predominate over questions affecting only individual members, including, *inter alia*, the following:

      i.    Whether Rodan + Fields' omissions or partial representations regarding Lash Boost misled reasonable consumers;

      ii.    Whether the product packaging and labeling was unlawful, unfair, or deceptive;

      iii.    Whether Rodan + Fields knew about the adverse side effects associated with its product;

      iv.    Whether Rodan + Fields knew of the side effects associated with other prostaglandin analogs;

      v.    What representations Rodan + Fields should have made to consumers on

its labeling or packaging;

      vi.      Whether consumers had a reasonable expectation that the product had adverse side effects;

      vii.     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief, and if so, in what amount; and

      viii.    Whether Rodan + Fields continues to unlawfully conceal or make partial representations concerning the side effects of Lash Boost.

**Typicality: Federal Rule of Civil Procedure 23(a)(3)**

152.    Plaintiffs' claims are typical of the claims of the Class because their claims arise from the same course of conduct by Rodan + Fields and Plaintiffs and Class members have been similarly affected by Defendant's course of conduct.

**Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

153.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. In addition, Plaintiffs and the proposed Class are represented by counsel who are competent and experienced; and Plaintiffs intend to prosecute the action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Federal Rule of Civil Procedure 23(b)(3)**

154.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

155.    Further, individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the

class action device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court.

**Rule 23(c)(4) Issue Class**

156.    In the alternative to a Nationwide Class, Plaintiffs seek a Nationwide Issue Class

("Issue Class") to resolve common issues in this litigation: whether the label is misleading and whether

the warnings were inadequate.

157.    Rule 23(c)(4) allows "particular issues" to be "brought or maintained as a class action."

158.    The Issue Class is appropriate under Rule 23(c)(4) because Rodan + Fields sold the

same Lash Boost with the same product labels that failed to disclose the nature, extent, and severity of

all of the adverse effects of Lash Boost across the country.  Rodan + Fields knew that one of the

ingredients in Lash Boost, isopropyl cloprostenate (a prostaglandin analog), had potentially harmful

side effects—and should have disclosed those side effects to consumers across the United States.

159.    The particular issues sought to be certified under Rule 23(c)(4) are:

i.    Whether (a) Rodan + Fields, including its employees and agents, and (b)

the nationwide network of consultants who sell Rodan + Fields' products, constituted an

association-in-fact enterprise; and

ii.    Whether such association-in-fact enterprise engaged in a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5).

160.    Plaintiffs seek certification under Rule 23(c)(4) and Plaintiffs bring this action on behalf

of themselves and all others similarly situated, defined as follows:

161.    All persons within the United States of America who purchased and/or paid for Lash

Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in

2016 until the present ("Issue Class").

162.    Excluded from the Issue Class are, Defendant; any entity in which Defendant has a

controlling interest; Defendant's officers, directors, affiliates, legal representatives, employees, co-

conspirators, successors, subsidiaries, and assigns; the judicial officers and associated court staff assigned to this case, and the immediate family members of such officers and staff; and all persons who make a timely election to be excluded from the Class.

**The State Classes**

163.    In addition to and in the alternative to the Nationwide Class described above, Plaintiffs seek certification of six separate statewide classes pursuant to Rule 23(b)(3) and (c)(5), the "State Classes."

164.    The California State Class consists of all persons in California who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("California State Class").

165.    The Florida State Class consists of all persons in Florida who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash boost in 2016 until the present ("Florida State Class").

166.    The Illinois State Class consists of all persons in Illinois who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("Illinois State Class").

167.    The Massachusetts State Class consists of all persons in Massachusetts who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("Massachusetts State Class").

168.    The New York State Class consists of all persons in New York who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("New York State Class").

169.    The Washington State Class consists of all persons in Washington who purchased Lash Boost and/or paid for Lash Boost manufactured, distributed, and/or marketed by Rodan + Fields from the launch of Lash Boost in 2016 until the present ("Washington State Class").

170.    Excluded from the State Classes are Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; the judicial officers and associated court staff assigned to this case, and the immediate family members of such officers and staff; and all persons who make a timely election to be excluded from the Class.

171.    Plaintiffs allege State Classes pursuant to Rule 23(c)(5), on behalf of residents of the states of California, Florida, Illinois, Massachusetts, New York, and Washington.

172.    Counts 1-21 are properly brought and should be maintained as class actions under Rule 23(a), (b)(3), and (c)(5), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

A.    **Numerosity:** Joinder of the individual members of each State Class would be impracticable.  Lash Boost has been purchased by hundreds of residents of California, Florida, Illinois, Massachusetts, New York, and Washington.

B.    **Commonality**: Questions of law and fact are common within each State Class and predominate over questions affecting only individual members, including, *inter alia*, the following:

i.    Whether Rodan + Fields' omissions or partial representations regarding Lash Boost misled reasonable consumers;

ii.    Whether the product packaging and labeling was unlawful, unfair, or deceptive;

iii.    Whether Rodan + Fields knew or should have known about the adverse side effects associated with its product;

iv.    Whether Rodan + Fields knew or should have known of the side effects associated with other prostaglandin analogs;

v.      What representations Rodan + Fields should have made to consumers on its labeling or packaging;

vi.     Whether consumers had a reasonable expectation that the product had adverse side effects.

C.      **Typicality:** Each Plaintiff's claims are typical of the claims of those who reside in the same state because their claims arise from the same course of conduct by Rodan + Fields; i.e. unfair, unlawful, deceptive, and fraudulent marketing practices related to Lash Boost.  Plaintiffs are typical class representatives because, like all members of each State Class, they purchased Lash Boost and Rodan + Fields omitted and did not disclose the adverse side effects associated with Lash Boost.

D.      **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the State Classes.  Their consumer protection claims, fraud, and malpresentation claims are common to all members of Class and Plaintiffs have a strong interest in vindicating their rights-the same rights at stake within the Class.  In addition, Plaintiffs and the proposed Class are represented by counsel who are competent and experienced in both consumer protection and class action litigation.

173.    Certification is appropriate under Rule 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of each State Class.  Common questions include, but are not limited to, the following: (1) Whether Rodan + Fields' omissions or partial representations misled reasonable consumers; (2) Whether the product packaging and labeling was unlawful, unfair, or deceptive; (3) Whether Rodan + Fields knew or should have known about the adverse side effects associated with its product; (4) Whether Rodan + Fields knew or should have known of the side effects associated with other prostaglandins; (5) What representations Rodan + Fields should have made to consumers on its label; and (6) Whether consumers had a reasonable

expectation that the product had adverse side effects. Thus, the common issues of law and fact pertaining to each State Class predominate over any individual issues.

174.    In addition, bringing this action as a Class is a superior mechanism for resolving this controversy because, *inter alia*, individual joinder of each consumer within each State Class is wholly impracticable; the economic damages suffered by the individual members may be relatively modest compared to the expense and burden of individual litigation; the court system would benefit from the class actions because individual litigation would overload court dockets and magnify the delay and expense to all parties; the class action device presents far fewer management difficulties; the class action device provides the benefit of comprehensive supervision by a single court with economies of scale; and individual litigation by members would not be effective in stopping Rodan + Fields' unfair and unlawful conduct which will continue unless stopped by these class actions.

175.    Notice of each Class could be provided by publication in state and local publications, through the creation of a public website, and through individual mailings.

176.    To the extent notice is required under California's consumer protection statutes, Plaintiffs will comply or have complied.

## V.    VIOLATIONS OF STATE LAWS OF CALIFORNIA, FLORIDA, ILLINOIS, MASSACHUSETTS, NEW YORK AND WASHINGTON

177.    Plaintiffs Lewis and Buckingham, on behalf of themselves and the California State Class, bring this action against Rodan + Fields for violations of California's False Advertising law, Unfair Competition law, and fraud (Counts 1-5).

178.    Plaintiff Bobbie Joe Huling, on behalf of herself and the Florida State Class, bring this action against Rodan + Fields for violations of the Florida Unfair and Deceptive Practices Act, and fraudulent misrepresentation, fraudulent concealment and negligent misrepresentation (Counts 6-8).

179.    Plaintiff Whetsell, on behalf of herself and the Illinois State Class, bring this action against Rodan + Fields for violations of Illinois' Consumer Fraud and Deceptive Business Practices

Act, fraudulent concealment, and negligent misrepresentation (Counts 9-11).

180.    Plaintiff Martha Merle on behalf of herself and the Massachusetts State Class, bring this action against Rodan + Fields for violations of Massachusetts' General Chapter 93(A), fraud, fraudulent concealment, and negligent misrepresentation.  (Counts 12-14).

181.    Plaintiffs Hufnagel, Gattuso, and Wagner, on behalf of themselves and the New York State Class, bring this action against Rodan + Fields for violations of New York state consumer protection statutes and fraud (Counts –15-16).

182.    Plaintiff Dixie Williams, on behalf of herself and the Washington State Class, bring this action against Rodan + Fields for violations of the Washington Consumer Protection Act, fraudulent concealment and negligent misrepresentation (Counts 17-19).

183.    The allegations alleged herein deal exclusively with the harm caused by Rodan + Fields through its unfair and unlawful marketing practices to consumers.  Plaintiffs' consumer protection claims deal exclusively with consumer protection and the money spent by consumers for a product which, as labeled and marketed, should not have been on the market.

**COUNT ONE — (CALIFORNIA STATE CLASS) VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDY ACT, CAL. CIV. CODE §§ 1750, ET SEQ.**

184.    Plaintiffs Lewis and Buckingham, who are residents of California, incorporate by reference all other allegations in this Complaint as if fully restated here.

185.    This claim is brought by Lewis and Buckingham on behalf of the California State Class.

186.    California's Consumer Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750, et seq. makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices intended to result, or which results, in the sale or lease of goods or services to any consumer.  Further, misleading omissions of fact may be actionable under the CLRA.

187.    Rodan + Fields, in the labeling that accompanied every unit of Lash Boost that was sold, omitted material facts in their product warnings that they were obligated to disclose.  The

material information omitted from the product warnings that accompanied the product was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

188.    Plaintiffs Lewis and Buckingham and the California State Class were, and continue to be, at all times material to the Complaint, "consumers" and "persons" as defined by Cal. Civ. Code § 1761.  Plaintiffs Lewis and Buckingham, as well as the California State Class, purchased and/or paid for Lash Boost for personal use during the relevant time period.

189.    As alleged throughout this Complaint, Rodan + Fields engaged in unfair, deceptive, and/or unlawful marketing in violation of Civ. Code § 1770(a) by deceptively failing to disclose side effects of use of Lash Boost to the California State Class.  In its Lash Boost labeling and marketing, Rodan + Fields concealed and misrepresented by omission the adverse side effects, severity, and duration of side effects associated with use of Lash Boost and its prostaglandin analog ingredient.

190.    In doing so, Rodan + Fields violated Cal. Civ. Code § 1770(a)(7).  Specifically, Rodan + Fields represented to Plaintiff Lewis and Buckingham and the Class that Lash Boost was of a particular standard, quality, or grade when it was of another.  By including a warning in its labeling, but failing to warn of serious side effects, Rodan + Fields was in effect stating that there *were* no serious side effects.  A reasonable consumer would believe that a cosmetic's warning label would contain complete material warnings about the risks of use. Rodan + Fields' concealment and omissions regarding the adverse side effects of Lash Boost was a material omission and misstatement that would cause consumers to believe, incorrectly, that Lash Boost was safe and did not have potentially serious side effects.

191.    Plaintiffs Lewis and Buckingham relied on the adequacy of the disclosures made by Rodan + Fields, which omitted material facts.  Plaintiffs were confident in the truth and completeness of Rodan + Fields' representations and acted upon this confidence by purchasing and using Lash Boost.  Had the omitted information been disclosed, Plaintiffs Lewis and Buckingham would have

been aware of it and would not have purchased Lash Boost.

192.    Plaintiffs Lewis and Buckingham were exposed to or relied on Rodan + Fields' unfair, deceptive, and/or unlawful marketing practices, including, *inter alia*, the material omissions on the labeling described above.  The California State Class was uniformly exposed to Rodan + Fields' material omissions regarding the safety and efficacy and side effects of the Lash Boost product.

193.    Plaintiffs Lewis and Buckingham lost money as a result of Rodan + Fields' unfair, deceptive, and/or unlawful marketing practices pursuant to Cal. Civ. Code § 1770(a), through the purchase of Lash Boost that was illegally advertised and marketed in violation of Cal. Civ. Code § 1770(a).

194.    Rodan + Fields actions were the result of a deliberate corporate policy and for profit, rather than an isolated incident, and were morally wrong and/or callous.

195.    As a result of Rodan + Fields' violations of the California's Consumer Legal Remedies Act, Plaintiffs Lewis and Buckingham and the California Class seek actual damages, attorneys' fees and costs, and for such other relief as set forth below.

196.    Plaintiffs Lewis and Buckingham reserve the right to amend this Complaint to seek punitive damages.

197.    Plaintiffs provided more than 30 days' notice to Rodan + Fields in advance of adding this claim, in accordance with California Civil Code §1782.

**COUNT TWO — (CALIFORNIA STATE CLASS) VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.**

198.    Plaintiff Lewis and Plaintiff Buckingham incorporate by reference all other allegations in this Complaint as if fully restated here.

199.    This claim is brought by Lewis and Buckingham on behalf of the California State Class.

200.    California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., protects both consumers and competitors by promoting fair competition in commercial markets for

goods and services.  California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice.  Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of California's Unfair Competition Law.

201.    Rodan + Fields engaged in substantial advertising and marketing of Lash Boost within the State of California.

202.    Because of Rodan + Fields' unlawful, unfair, and fraudulent business practices, Plaintiffs Lewis and Buckingham and the Class were misled into purchasing and using Lash Boost. Plaintiffs Lewis and Buckingham relied, to their detriment, on Rodan + Fields' material omissions, which led them to believe, incorrectly, that Lash Boost was safe and did not have potentially serious side effects.  The California State Class was uniformly exposed to these unlawful and unfair business practices.  Plaintiff Lewis, Plaintiff Buckingham, and the California State Class seek an award of full restitution, and/or for such other relief as may be set forth below or ordered in the discretion of the Court.

**COUNT THREE — (CALIFORNIA STATE CLASS) VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

203.    Plaintiffs Lewis and Plaintiff Buckingham incorporate by reference all other allegations in this Complaint as if fully restated here.

204.    This claim is brought by Lewis and Buckingham on behalf of the California State Class.

205.    Plaintiffs Lewis and Buckingham and the Class bring a cause of action against Rodan + Fields pursuant to Cal. Bus. & Prof. Code §§ 17500, et seq. ("California's False Advertising Law").

206.    The purpose of California's False Advertising Law is to protect consumers from false or misleading advertising and promotions.  California's False Advertising Law prohibits the false or deceptive advertising of products to consumers in any form of media, when the company placing the advertisement knows, or should have known, that the advertisement would be likely to mislead

consumers about a material aspect of a product.

207.    Rodan + Fields uses advertising on its website and through various outlets (including Facebook) to sell and market Lash Boost directly to consumers.  The advertisements and labeling are deceptive, or misleading within the meaning of California's False Advertising Law, because they omit adequate warnings and fail to fully disclose material facts to consumers about the existence, severity, and duration of symptoms and adverse side effects associated with using the product.

208.    In making its product labeling and disseminating statements alleged herein, Rodan + Fields knew or should have known that the statements were untrue or misleading, and that it acted in violation of California's False Advertising Law.  Rodan + Fields knew or should have known the of the existence, severity, and duration of symptoms and adverse side effects associated with using the product.

209.    Rodan + Fields' omissions of material facts related to Lash Boost, as detailed above, constitute false and misleading advertising in violation of California's False Advertising Law.

210.    Through its deceptive and unlawful marketing practices, Rodan + Fields has improperly and illegally obtained money from Plaintiff Lewis, Plaintiff Buckingham, and the California State Class.

211.    Pursuant to California's False Advertising Law, specifically Cal. Bus. & Prof. Code § 17535, Plaintiff Lewis, Plaintiff Buckingham, and the California State Class seek an award of full restitution of all monies wrongfully acquired by means of Rodan + Fields' false advertising, and/or for such other relief as may be set forth below or ordered in the discretion of the Court.

**COUNT FOUR — (CALIFORNIA STATE CLASS) NEGLIGENT MISREPRESENTATION**

212.    Plaintiffs Lewis and Buckingham incorporate by reference all other allegations in this Complaint as fully restated here.

213.    This claim is brought by Lewis and Buckingham on behalf of the California State Class.

214.    Rodan + Fields omitted to disclose the adverse side effects associated with Lash Boost

1   in its product packaging and labeling.  The material information omitted from the product packaging

2   and labeling that accompanied the product was also not to be found in Rodan + Fields' advertising, on

3   its website, or in its product marketing materials.

4       215.    Rodan + Fields had no reasonable grounds to believe that its warnings were not

5   deceptive about material facts, particularly when the side effects associated with prostaglandin analogs

6   are well established within the medical and scientific community; when Rodan + Fields claims that

7   Lash Boost was ophthalmologist tested; when Latisse, a primary competitor of Rodan + Fields' Lash

8   Boost, which also contains a prostaglandin analog, discloses side effects associated with Latisse; and

9   when Rodan + Fields consumers publicly disclosed significant side effects associated with using the

10  product that were consistent with  the side effects identified in medical research and by the producers

11  of Latisse.

12      216.    Rodan + Fields intended to induce Plaintiffs and consumers to rely on its partial

13  warnings that omitted material information.

14      217.    Plaintiffs relied upon the nondisclosures when purchasing Lash Boost, and were

15  justified in relying upon the sufficiency of Rodan + Fields warning and product labeling when

16  purchasing Lash Boost.

17      218.    Rodan + Fields knew that an ingredient in Lash Boost was associated with adverse side

18  effects and failed to disclose them to consumers.  Rodan + Fields perpetrated this misrepresentation by

19  providing some inadequate warnings, while failing to disclose the more serious side effects on the

20  product itself.

21      219.    Rodan + Fields' omissions were intended to induce reliance.  By providing some

22  warnings on its product, while failing to disclose adverse side effects associated with Lash Boost

23  translated into higher profits for Rodan + Fields than would have been possible if Rodan + Fields had

24  fully disclosed the nature and extent of the adverse side effects associated with Lash Boost.

220.    Rodan + Fields' omissions were material.  Plaintiffs would not have purchased Lash Boost or would have paid less for the product if Plaintiffs knew of the adverse side effects associated with Lash Boost that were not disclosed.

221.    Rodan + Fields intended to induce consumers to rely on its omissions.  Rodan + Fields knew that by not disclosing all of the adverse side effects it would sell more Lash Boost products. Rodan + Fields had reason to expect that Plaintiffs and consumers would rely on their product safety disclosures.

222.    Given that the harmful side effects associated with Lash Boost were not fully disclosed by Rodan + Fields before consumers purchased and used the product, Plaintiffs were justified in their failure to discover the fraud until after they purchased the product.

223.    Plaintiffs were harmed by Rodan + Fields' fraudulent conduct because it sold Lash Boost to Plaintiffs without disclosing harmful side effects.

224.    Wherefore, Plaintiffs prayers for relief are set forth below.

**COUNT FIVE — (CALIFORNIA STATE CLASS) FRAUDULENT CONCEALMENT**

225.    Plaintiffs Lewis and Buckingham incorporate by reference all other allegations in this Complaint as fully restated here.

226.    This claim is brought by Lewis and Buckingham on behalf of the California State Class.

227.    Rodan + Fields concealed and suppressed facts including the nature, extent, and duration of adverse side effects associated with Lash Boost.  These facts were material.

228.    Rodan + Fields was under a duty to disclose the suppressed facts.  This duty to disclose arose from their relationship as a manufacturer and seller of consumer goods and because it provided a partial warning on its product that did not fully disclose the adverse side effects.  The material information omitted from the product packaging and labeling that accompanied the product was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

229.    Because Rodan + Fields was selling products to consumers it had a duty to disclose

facts material to the transaction—namely, the adverse side effects associated with using the Lash Boost product.

230.    Rodan + Fields knew that an ingredient in Lash Boost was associated with adverse side effects and failed to disclose them to consumers.  Rodan + Fields perpetrated this fraud and misrepresentation by providing some inadequate warnings, while failing to disclose the more serious side effects on the product itself.

231.    Rodan + Fields intentionally concealed and suppressed facts regarding the adverse side effects associated with Lash Boost with the intent to defraud Plaintiffs and consumers.

232.    When Plaintiffs purchased Lash Boost, they were unaware of the adverse side effects associated with the Product.  Plaintiffs would not have purchased Lash Boost if they had known of the concealed and suppressed facts regarding its adverse side effects.

233.    As a result of the concealment and suppression of the material facts relating to the adverse side effects associated with Lash Boost, Plaintiffs were injured in that they experienced a side effect associated with prostaglandin analogs that was not disclosed by Rodan + Fields in its product packaging, on the product label, or in its advertising.

234.    As a proximate cause of the concealment, suppressions of fact, and nondisclosures, Rodan + Fields caused Plaintiffs to purchase Lash Boost, and after the transaction occurred, plaintiffs suffered damage.

**COUNT SIX — (FLORIDA STATE CLASS) VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE PRACTICES ACT (FLA. STAT. § 501.21, ET. SEQ)**

235.    Plaintiff Bobbie Joe Huling who is a resident of Florida, incorporates by reference all other allegations in this Complaint as if fully restated here.

236.    This claim is brought by Bobbie Joe Huling on behalf of the Florida State Class.

237.    The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in

the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

238.   Plaintiff and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

239.   Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

240.   As alleged throughout this complaint, Rodan + Fields engaged in unfair methods of competition, unconscionable acts and unfair and deceptive acts or practices in violation of Fla. Stat. § 501.204(1) by deceptively failing to disclose serious side effects of Lash Boost to the Florida State Class.  Rodan + Fields sold and marketed Lash Boost while concealing, omitting, and misrepresenting by partial disclosure in its inadequate warnings, the adverse side effects, severity, and duration of side effects associated with the use of Lash Boost and its synthetic prostaglandin analog ingredient.

241.   Rodan + Fields concealed and suppressed material facts including the nature, extent, and duration of adverse side effects associated with Lash Boost, including by failing to disclose the harmful and potentially permanent side effects associated with Lash Boost.  These facts were material.

242.   By concealing and suppressing material facts regarding the side effects of Lash Boost, Rodan + Fields intended to induce Plaintiffs' reliance on the deception.  By not disclosing side effects, Rodan + Fields intended consumers to believe that Lash Boost did not have the same side effects as other drug products on the market which disclose the side effects associated with prostaglandin analogs.  Rather, Rodan + Fields distinguished itself in marketing materials from other products on the market with known side effects, thus inducing plaintiffs to believe that the product did not have the same adverse side effects.

243.   This deception occurred in the course of conduct involving commerce---the sale of Lash Boost.

244.   The consumer fraud proximately caused Plaintiff's injuries.

245.    Defendant is liable to Plaintiff and the Florida State Class for damages to be proven at trial under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1), as well as any other just and proper relief available under the FUDTPA.

**COUNT SEVEN — (FLORIDA STATE CLASS) – FRAUDULENT MISREPRESENTATION**

246.    Plaintiff Bobbie Joe Huling who is a resident of Florida, incorporates by reference all other allegations in this Complaint as if fully restated here.

247.    This claim is brought by Bobbie Joe Huling on behalf of the Florida State Class.

248.    Rodan + Fields misrepresented to consumers the adverse side effects associated with Lash Boost, by partially providing warnings while concealing and not disclosing the serious adverse side effects associated with Lash Boost, and prostaglandin analogs in particular.  The material information omitted from the product packaging and labeling that accompanied the product was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

249.    Rodan + Fields' partial (and hence deceptive) representations were intended to induce reliance so that consumers would purchase Lash Boost.  Failing to disclose adverse side effects associated with Lash Boost translated into higher profits for Rodan + Fields than would have been possible if Rodan + Fields had fully disclosed the nature and extent of the adverse side effects associated with Lash Boost.

250.    Rodan + Fields concealed and suppressed facts including the nature, extent, and duration of side effects associated with Lash Boost.  These facts were material.

251.    Rodan + Fields knew or should have known that the material facts (the serious adverse side effects associated with Lash Boost) should be disclosed, particularly when: (a) there is established medical literature finding the side effects associated with prostaglandin analogs,  (b) when Rodan + Fields claims to be ophthalmologist tested, and (c) when Rodan + Fields specifically distinguished itself from known serious side effects associated with other products using prostaglandin analogs.

252.    Rodan + Fields had a duty to disclose the suppressed facts.  This duty to disclose arose

from their relationship as a manufacturer and seller of consumer goods where Rodan + Fields occupied a status and held itself out as a source of trusted information, a company started by two doctors with the "philosophy to create safe and effective formulations" that would not market irritating or unsafe products.  Further, because Rodan + Fields provided a warning label on its product, this further obligated Rodan + Fields to disclose the safety risks associated with the use Lash Boost.

253.    Further, because Rodan + Fields was selling Lash Boost to consumers and possessed superior knowledge regarding the Product, including the side effects associated with Lash Boost, which had the potential to cause personal injury, Rodan + Fields had a duty to disclose these facts material to the transaction to consumers; namely the adverse side effects associated with using the Lash Boost product.

254.    Rodan + Fields' omissions were material.  Plaintiff would not have purchased Lash Boost if Plaintiff knew of the adverse side effects associated with Lash Boost that were not disclosed.

255.    Rodan + Fields intended to induce consumers to rely on its safety disclosures.  Rodan + Fields knew that by not disclosing all of the of adverse side effects it would sell more Lash Boost products.  Rodan + Fields had reason to expect that Plaintiff and consumers would rely on its warnings.

256.    Plaintiff relied upon the nondisclosures when purchasing Lash Boost and suffered a consequent injury by acting in reliance on Rodan + Fields failure to advise of serious adverse side effects associated with Lash Boost.  Plaintiff would not have purchased Lash Boost if Plaintiff had known of the concealed and suppressed facts regarding the adverse side effects.

**COUNT EIGHT —  (FLORIDA STATE CLASS) – NEGLIGENT MISREPRESENTATION**

257.    Plaintiff Bobbie Joe Huling who is a resident of Florida, incorporates by reference all other allegations in this Complaint as if fully restated here.

258.    This claim is brought by Bobbie Joe Huling on behalf of the Florida State Class.

259.    Rodan + Fields misrepresented to the Class the adverse side effects associated with

Lash Boost by not disclosing the adverse side effects associated with Lash Boost, and prostaglandin analogs in particular.

260.   In its warnings in its product packaging and labeling, Rodan + Fields omitted to state to the Class the adverse side effects associated with Lash Boost.  The material information omitted from the product packaging was also not to be found in Rodan + Fields' advertising, on its website, in its product packaging, labeling, and sales and marketing materials.

261.   Rodan + Fields should have known that its partial representations on its product packaging were not entirely truthful and omitted material information.

262.   Rodan + Fields intended to induce Plaintiff to rely upon the omissions and partial truths in its product labeling.

263.   Plaintiff acted in justifiable reliance upon these misrepresentations when purchasing and using Lash Boost, which resulted in injury.

264.   Wherefore, Plaintiff's prayers for relief are set forth below.

**COUNT NINE — (ILLINOIS STATE CLASS) VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP. STAT. 505/1, ET SEQ. AND 720 ILL. COMP. STAT. 295/1A.**

265.   Plaintiff Whetsell hereby incorporates by reference all other allegations in this Complaint as fully restated here.

266.   This claim is brought by Plaintiff Whetsell on behalf of the Illinois State Class.

267.   The Illinois Consumer Fraud and Deceptive Practices Act (Illinois CFA) prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment or any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of trade or commerce…whether any person has in fact been misled, deceived, or damaged thereby." 815 Ill. Comp. Stat. 505/2.

268.   Each defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

269.    Plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

270.    Rodan + Fields concealed and suppressed material facts including the nature, extent, and duration of adverse side effects associated with Lash Boost, including by failing to disclose the harmful and potentially permanent side effects associated with Lash Boost.  These facts were material.

271.    By concealing and suppressing material facts regarding the side effects of Lash Boost, Rodan + Fields intended to induce Plaintiffs' reliance on the deception.  By not disclosing side effects and providing partial disclosures in its warnings labels, Rodan + Fields intended consumers to believe, incorrectly, that Lash Boost did not have serious side effects.

272.    This deception occurred in the course of conduct involving commerce—the sale of Lash Boost.

273.    The consumer fraud proximately caused Plaintiff's injuries.

274.    Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiff seeks monetary relief against defendant in the amount of actual damages, as well as punitive damages because defendant acted with fraud and/or malice and/or was grossly negligent.

## COUNT TEN — (ILLINOIS STATE CLASS) FRAUDULENT CONCEALMENT/MISREPRESENTATION

275.    Plaintiff Whetsell incorporates by reference all other allegations in this Complaint as if fully restated here.

276.    This claim is brought by Plaintiff Whetsell on behalf of the Illinois State Class.

277.    Rodan + Fields concealed and suppressed facts including the nature, extent, and duration of adverse side effects associated with Lash Boost.  These facts were material.  Plaintiff would have acted differently had she known the concealed information, and the concealed information concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase a product.

278.     The warnings by Rodan + Fields omitted and concealed material information.  Rodan + Fields knew that serious side effects existed, or its partial representations were made in culpable ignorance of their falsity, and Rodan + Fields did not truthfully disclose the known side effects associated with prostaglandin analogs.

279.     Rodan + Fields omitted facts regarding side effects associated with Lash Boost.  The exclusive knowledge regarding the truth or falsity of the Lash Boost warnings was not readily ascertainable by Plaintiff.

280.     The statements that omitted the true nature, extent, and duration of the side effects of Lash Boost were made for the purpose of inducing reliance, and such reliance led to Plaintiff's injuries.

281.     Plaintiff relied on the omissions of Rodan + Fields to Plaintiff's detriment.

282.     At the time that Plaintiff purchased Lash Boost Plaintiff was unaware of the undisclosed adverse side effects associated with Lash Boost.  Plaintiff would not have purchased Lash Boost if she had known of the concealed and suppressed facts regarding the adverse side effects.

283.     As a result of the concealment and suppression of the material facts, relating to the adverse side effects associated with Lash Boost, Plaintiff was injured in that she experienced a side effect associated with prostaglandin analogs that was not disclosed by Rodan + Fields in its product packaging, on the product label, or in its advertising, and Plaintiff would not have purchased Lash Boost had the side effects been disclosed.

284.     As a proximate cause of the material omissions of fact, Rodan + Fields caused Plaintiff to purchase Lash Boost, and after the transaction occurred, Plaintiff suffered damage.

**COUNT ELEVEN — (ILLINOIS STATE CLASS) NEGLIGENT MISREPRESENTATION**

285.     Plaintiff Whetsell incorporates by reference, all other allegations in this Complaint as if fully restated here.

286.     This claim is brought by Plaintiff Whetsell on behalf of the Illinois State Class.

287.     In its warnings in its product packaging and labeling, Rodan + Fields omitted to state to

the Class the adverse side effects associated with Lash Boost. The material information omitted from the product packaging was also not to be found in Rodan and Fields' advertising, on its website, or in its product marketing materials.

288. Rodan + Fields had no reasonable grounds to believe that its product warnings were adequate, particularly when the side effects associated with prostaglandin analogs are well established among eye doctors, and Rodan + Fields claims that Lash Boost was ophthalmologist tested; when Latisse, a primary competitor of Rodan + Fields' Lash Boost, which also contains a prostaglandin analog, discloses side effects associated with prostaglandin analogs; and when Rodan + Fields consumers publicly disclosed significant complaints and side effects associated with using the product that were consistent with the side effects identified in medical research and by the producers of Latisse.

289. Rodan + Fields was careless or negligent in ascertaining the truth of the adequacy of its warnings to consumers regarding Lash Boost.

290. Rodan + Fields intended to induce Plaintiff to rely on its partial representations and its omissions and to act by purchasing Lash Boost.

291. Plaintiff relied upon the nondisclosures when purchasing Lash Boost, and was justified in relying upon Rodan + Fields' partial representations and material omissions when purchasing Lash Boost.

292. Damages resulted from Plaintiff's reliance. Plaintiff was harmed by Rodan + Fields omissions because it sold Lash Boost to Plaintiff without disclosing harmful side effects.

293. Rodan + Fields had a duty to communicate accurate information regarding the side effects associated with Lash Boost, particularly when reliance on such information might result in physical injury. Rodan + Fields negligently conveyed false information that resulted in physical injury and pecuniary harm to Plaintiff.

294. Rodan + Fields is in the business of supplying information for the guidance of

consumers with respect to the sale of its products and failed to disclose material information that could potentially cause serious harm to consumers.

**COUNT TWELVE — (MASSACHUSETTS STATE CLASS) VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 3A, § 1, *ET. SEQ.*)**

295.    Plaintiff Martha Merle, who is a resident of Massachusetts, incorporates by reference all other allegations in this Complaint as if fully restated here.

296.    This claim is brought by Martha Merle on behalf of the Massachusetts State Class.

297.    Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

298.    Defendant, plaintiff, and class members are "persons" within the meaning of Mass. Gen. Laws. ch. 93A, § 1(a).

299.    Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

300.    As alleged throughout this complaint, Rodan + Fields engaged in unfair methods of competition, unconscionable acts, and unfair and deceptive acts or practices in violation of Mass Gen. Laws ch. 93A by deceptively failing to disclose serious side effects of Lash Boost to the Class, the disclosure of which may have influenced a person not to enter into the transaction.

301.    Rodan + Fields sold and marketed Lash Boost while concealing the adverse side effects, severity, and duration of side effects associated with the use of Lash Boost and its synthetic prostaglandin analog ingredient.

302.    Rodan + Fields concealed and suppressed material facts including the nature, extent, and duration of adverse side effects associated with Lash Boost, including by failing to disclose the harmful and potentially permanent side effects associated with Lash Boost.  These facts were material.

303.    By concealing and suppressing material facts regarding the side effects of Lash Boost, Rodan + Fields intended to induce Plaintiff's reliance on the deception.  By not disclosing side effects,

Rodan + Fields intended consumers to believe that Lash Boost did not have serious side effects.

304.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff will seek monetary relief measured as the greater of (a) actual damages in the amount to be determined at trial and (b) statutory damages in the amount of $25 per plaintiff.  Because Defendant's conduct was committed willfully and knowingly, Plaintiff is entitled to recover up to three times actual damages, but no less than two times actual damages.

305.    Plaintiff also seeks punitive damages, attorney's fees and costs, and any other just and proper relief available under the Massachusetts Act.

306.    Plaintiff seeks all damages and relief to which she is entitled, as set forth below.

## COUNT THIRTEEN — (MASSACHUSETTS STATE CLASS) FRAUDULENT MISREPRESENTATION

307.    Plaintiff Merle incorporates by reference all other allegations in this complaint as if fully restated here.

308.    This claim is brought by Plaintiff Merle on behalf of the Massachusetts State Class.

309.    Rodan + Fields engaged in fraudulent misrepresentation when it failed to disclose the adverse side effects associated with Lash Boost in its product packaging and product labeling.  The material information omitted from the product packaging and labeling was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

310.    Rodan + Fields knew that an ingredient in Lash Boost was associated with adverse side effects and failed to disclose that fact to consumers.

311.    Rodan + Fields' deceptive, partial, and inadequate warnings were intended to defraud and induce reliance.  Failing to disclose all of the adverse side effects associated with Lash Boost translated into higher profits for Rodan + Fields than would have been possible if Rodan + Fields had fully disclosed the nature and extent of the adverse side effects associated with Lash Boost.

312.    Rodan + Fields' omissions were material.  Plaintiff Merle would not have purchased

Lash Boost if Plaintiff Merle knew of the adverse side effects associated with Lash Boost that were not disclosed.

313.    Rodan + Fields intended to induce consumers to rely on its product warnings.  Rodan + Fields knew that by not disclosing all of the adverse side effects it would sell more Lash Boost products.

314.    Plaintiff relied upon the partial representations and nondisclosures when purchasing Lash Boost.

315.    Plaintiff was justified in relying upon Rodan + Fields' partial representations and omissions when purchasing Lash Boost.

316.    Given that the harmful side effects associated with Lash Boost were not fully disclosed by Rodan + Fields before consumers purchased and used the product, Plaintiff was justified in her failure to discover the fraud until she was harmed.

317.    Plaintiff was harmed by Rodan + Fields' conduct because it sold Lash Boost to Plaintiff without disclosing harmful side effects.

318.    Wherefore, Plaintiff's prayers for relief are set forth below.

### COUNT FOURTEEN — (MASSACHUSETTS STATE CLASS) NEGLIGENT MISREPRESENTATION

319.    Plaintiff Merle incorporates by reference all other allegations in this complaint as if fully restated here.

320.    This claim is brought by Plaintiff Merle on behalf of the Massachusetts State Class.

321.    In the course of its business, Rodan + Fields supplied false information to consumers of Lash Boost by failing to disclose to Plaintiff Merle and the Massachusetts State Class the adverse side effects associated with Lash Boost in its product packaging and labeling.  The material information omitted from the product packaging and labeling was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

322.    Rodan + Fields failed to exercise reasonable care or competence in obtaining or communicating the adverse side effects of Lash Boost to its consumers, particularly when the side effects associated with prostaglandin analogs are well established among eye doctors, and when Rodan + Fields claims that Lash Boost was ophthalmologist tested; when Latisse, a primary competitor of Rodan + Fields' Lash Boost, which also contains a prostaglandin analog, lists the side effects associated with prostaglandin analogs; when Rodan + Fields distinguishes the side effects of its product from serious side effects associated with other drug products; and when Rodan + Fields' consumers publicly disclosed significant side effects associated with using the product that were consistent with the side effects identified in medical research and by the producers of Latisse.

323.    Plaintiff relied upon the nondisclosures when purchasing Lash Boost and was justified in relying upon Rodan + Fields' partial disclosures and omissions when purchasing Lash Boost.

324.    Plaintiff was harmed by Rodan + Fields partial disclosures and omissions because it sold Lash Boost to plaintiff and class members without disclosing harmful side effects.  Wherefore, Plaintiff's prayers for relief are set forth below.

**COUNT FIFTEEN — (NEW YORK STATE CLASS) VIOLATIONS OF NEW YORK'S CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES LAW, N.Y. GEN. BUS. LAW §§ 349-350, ET SEQ**

325.    Plaintiffs Hufnagel, Gattuso, and Wagner incorporate by reference all other allegations in this Complaint as fully restated here.

326.    This claim is brought by Plaintiffs Hufnagel, Gattuso, and Wagner, on behalf of the New York State Class.

327.    New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349, makes it unlawful to engage in deceptive acts or practices in the conduct of any business, trade, or commerce.

328.    Plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

329.     Defendant is a "person," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349(b).

330.     Rodan + Fields' acts and practices in labeling and packaging Lash Boost were directed at consumers and had a broad impact on consumers.  As alleged throughout this Complaint, Rodan + Fields engaged in deceptive acts and practices by concealing the existence, severity, and duration of symptoms and adverse side effects associated with using the product.  These acts and practices were deceptive because they were likely to mislead a reasonable consumer acting reasonably under the circumstances.  For example, Rodan + Fields' concealment and misrepresentation regarding the existence, severity, and duration of symptoms and adverse side effects associated with using the product would cause a reasonable consumer to believe that the product was safe and did not have any permanent side effects.

331.     Such acts and practices caused injury to Plaintiff and the New York State Class.

332.     In addition, Rodan + Fields engaged in false advertising pursuant to N.Y. Gen. Bus. Law § 350-a, on its labeling, direct-to-consumer advertisements, and various other forms of promotion by misstating and failing to fully disclose the existence, severity, and duration of symptoms and adverse side effects associated with using the product.

333.     Rodan + Fields' deceptive acts and practices had an impact on the public at large.

334.     Plaintiffs Hufnagel, Gattuso, Wagner, and the New York State Class did not have a reasonable opportunity to discover facts about the nature and full extent of the adverse side effects associated with Lash Boost because they were not disclosed by Rodan + Fields.

335.     Plaintiffs Hufnagel, Gattuso, Wagner, and the New York State Class suffered injury as a result of Rodan + Fields' deceptive practices, including lost money from purchasing Lash Boost that was unlawfully advertised and marketed in violation of pursuant to N.Y. Gen. Bus. Law §§ 349 and 350.

336.     As a result of Rodan + Fields' violations of New York's Consumer Protection from Deceptive Acts and Practices Law, Plaintiffs Hufnagel, Gattuso, Wagner, and the New York State Class seek an order of this Court awarding the New York State Class, *inter alia*, actual damages, full refunds of all moneys spent on Lash Boost, restitution, attorneys' fees and costs, and/or for such other relief as may be set forth below or ordered by the Court.  Plaintiffs reserve the right to seek treble damages and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

337.     Plaintiffs seek all damages and relief to which they are entitled, as set forth below.

**COUNT SIXTEEN — (NEW YORK STATE CLASS) FRAUDULENT CONCEALMENT**

338.     Plaintiffs Hufnagel, Gattuso, and Wagner incorporate by reference all other allegations in this Complaint as fully restated here.

339.     This claim is brought by Plaintiffs Hufnagel, Gattuso, and Wagner on behalf of the New York State Class.

340.     Rodan + Fields concealed and suppressed facts including the nature, extent, and duration of adverse side effects associated with Lash Boost.  These facts were material.Rodan + Fields was under a duty to disclose the suppressed facts.  This duty to disclose arose from their relationship as a manufacturer and seller of consumer goods.  Because Rodan + Fields was selling products to consumers it had a duty to disclose facts material to the transaction—namely, the adverse side effects associated with using the Lash Boost product.  Further, Rodan + Fields made incomplete representations about Lash Boost and had a duty to disclose additional facts about the safety of its product.

341.     Rodan + Fields had knowledge of the suppressed facts.

342.     Rodan + Fields intentionally concealed and suppressed facts regarding the adverse side effects associated with Lash Boost with the purpose of inducing consumers to rely on their omissions and purchase Lash Boost.

343.     Plaintiffs justifiably and reasonably relied on the material omissions.

344.     When Plaintiffs purchased Lash Boost, Plaintiffs were unaware of the adverse side effects associated with it.  Plaintiffs would not have purchased Lash Boost if they had known of the concealed and suppressed facts regarding the adverse side effects.

345.     As a result of the concealment and suppression of the material facts relating to the adverse side effects associated with Lash Boost, Plaintiffs were injured in that they experienced a side effect associated with prostaglandin analogs that was not disclosed by Rodan + Fields in its product packaging, on the product label, or in its advertising.

346.     As a proximate cause of the concealment, suppressions of fact, and nondisclosures, Rodan + Fields caused Plaintiffs to purchase Lash Boost, and after the transaction occurred, plaintiffs suffered damage.

347.     Plaintiffs seek all damages and relief to which they are entitled, as set forth below.

**COUNT SEVENTEEN — (WASHINGTON STATE CLASS) VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE §§ 19.86.010, *ET SEQ.*)**

348.     Plaintiff Dixie Williams who is a resident of Washington, incorporates by reference all other allegations in this Complaint as fully restated here.

349.     This claim is brought by Plaintiff Williams on behalf of the Washington State Class.

350.     The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code. § 19.86.020.

351.     Defendant committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010.

352.     Rodan + Fields' acts and practices in selling Lash Boost were directed at consumers and have the capacity to deceive a substantial portion of the public.  As alleged throughout this Complaint, Rodan + Fields engaged in deceptive and unlawful acts and practices by concealing the existence, severity, and duration of symptoms and adverse side effects associated with using the product.

353.    Such acts and practices caused injury to Plaintiff and the Washington State Class.

354.    These acts were committed in the course of Defendant's business and the acts are part of a pattern or generalized course of conduct in consumer transactions (i.e. the omissions are uniform throughout Rodan + Fields' labeling).  Such omissions were committed well before Plaintiff purchased Lash Boost and there is a real and substantial potential for repetition of Defendant's conduct.  Rodan + Fields persists in failing to disclose all of the adverse side effects associated with Lash Boost.  Hence, many consumers are likely to be affected by Defendant's acts.

355.    Defendant is liable to Plaintiff and the Washington State Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090.

## COUNT EIGHTEEN — (WASHINGTON STATE CLASS) FRAUDULENT CONCEALMENT

356.    Plaintiff Dixie Williams incorporates by reference all other allegations in this Complaint as fully restated here.

357.    This claim is brought by Plaintiff Williams on behalf of the Washington State Class.

358.    Rodan + Fields concealed and suppressed facts including the nature, extent, and duration of adverse side effects associated with Lash Boost.  These facts were material.

359.    These statements did not truthfully disclose all of the side effects associated with Lash Boost.  Rodan + Fields knew that its disclosures were materially misleading by omission and had knowledge of the suppressed facts.

360.    Rodan + Fields intentionally concealed and suppressed facts regarding the adverse side effects associated with Lash Boost with the purpose of inducing consumers to rely on their omissions and purchase Lash Boost.

361.    Plaintiff justifiably and reasonably relied on the truth of Rodan + Fields disclosures.

362.    When Plaintiff purchased Lash Boost, Plaintiff was unaware of the adverse side effects associated with it.  Plaintiff would not have purchased Lash Boost if she had known of the concealed

and suppressed facts regarding the adverse side effects.

363. As a result of the concealment and suppression of the material facts relating to the adverse side effects associated with Lash Boost, Plaintiff was injured in that she would not have purchased the product had she been advised of the adverse side effects.

364. As a consumer, putting a product on her eyes, Plaintiff had a right to rely on the completeness of the disclosures made by Rodan + Fields regarding the safety and potential adverse side effects associated with the product.

365. As a proximate cause of the partial representations, concealment, suppressions of fact, and nondisclosures, Rodan + Fields caused Plaintiff to purchase Lash Boost, and after the transaction occurred, Plaintiff suffered damage.

366. Plaintiff seeks all damages and relief to which she is entitled, as set forth below.

**COUNT NINETEEN — (WASHINGTON STATE CLASS) NEGLIGENT MISREPRESENTATION**

367. Plaintiff Dixie Williams incorporates by reference all other allegations in this Complaint as fully restated here.

368. This claim is brought by Williams on behalf of the Washington State Class.

369. Rodan + Fields negligently supplied inaccurate and false information for the guidance of consumers that defendant knew or should have known would guide Plaintiff in making the decision to purchase Lash Boost.

370. Rodan + Fields misrepresented to the Class the adverse side effects associated with Lash Boost in its product packaging and labeling by concealing and not disclosing the adverse side effects associated with Lash Boost. The material information omitted from the product packaging and labeling itself was also not to be found in Rodan + Fields' advertising, on its website, or in its product marketing materials.

371. Plaintiff justifiably relied on the false and inadequate information, and the omitted

information was the proximate cause of the claimed damages.

372.    Plaintiff relied upon the nondisclosures when purchasing Lash Boost and was justified in relying upon Rodan + Fields' partial representations when purchasing Lash Boost.

373.    Rodan + Fields had a duty to disclose the full extent of the side effects associated with Lash Boost and the side effects associated with use of synthetic prostaglandin analogs.  The fact that the product contained a prostaglandin analog was within the knowledge of Rodan + Fields and could not be readily obtained by a consumer.

374.    Disclosure of the side effects associated with Lash Boost and prostaglandin analogs is necessary to prevent a partial or ambiguous statement of facts from being misleading.

375.    A consumer would reasonably expect a disclosure of the potential side effects associated with use of a product, particularly one that they apply to their eyelids.  Rodan + Fields' nondisclosure of the known side effects associated with prostaglandin analogs and their derivatives breached this duty of disclosure.

376.    Plaintiff was harmed by Rodan + Fields partial representations and omissions because it sold Lash Boost to Plaintiff without disclosing harmful side effects.  The harms Plaintiff suffered were not all disclosed by Rodan + Fields as potential adverse side effects.

377.    Wherefore, Plaintiff's prayers for relief are set forth below.

## NATIONWIDE CAUSE OF ACTION

### COUNT TWENTY — (NATIONWIDE CLASS) VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET. SEQ.*

378.    Plaintiffs Lewis, Buckingham, Huling, Whetsell, Merle, Hufnagel, Gattuso, Wagner, and Williams hereby incorporate by reference the allegations contained in the proceeding paragraphs of this Complaint.

379.    This claim is brought on behalf of the Nationwide Class against Rodan + Fields for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18

U.S.C. § 1962, *et seq*.

380. Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

381. Plaintiffs and the members of the Nationwide Class are each "persons," as the term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Rodan and Fields' Lash Boost fraudulent scheme.

**A.    The Enterprise**

382. Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

383. Rodan + Fields formed an association-in-fact enterprise.  The Enterprise consists of (a) Rodan + Fields, including its employees and agents; and (b) the nationwide network of consultants who sell Rodan + Fields' products.

384. The Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systemic links for a common fraudulent purpose.  This Enterprise promotes a product, Lash Boost, without fully disclosing its adverse side effects to consumers, to the exclusion or detriment of competitor products and consumers.

385. To accomplish this purpose, the Enterprise omits—to the general public and consumers—the harmful side effects associated with its Lash Boost product.  The Enterprise conceals from the general public and consumers the existence of harmful side effects associated with an ingredient in their product: isopropyl cloprostenate, a prostaglandin analog.  The Enterprise also indicates to the public that Lash Boost, "will not affect the structure or function of your lashes."  The FDA has previously noted that prostaglandin analogs are well known to have an effect on the structure or function of the body.

386.    The Enterprise thus conceals harmful known side effects associated with an ingredient contained in Lash Boost.  Marketing Lash Boost as a cosmetic enables Rodan + Fields to evade disclosure requirements of the FDA and defraud consumers.  This scheme of failing to disclose adverse side effects translated into higher profits for Rodan + Fields than would have been possible if they had fully disclosed the nature and extent of the adverse side effects associated with their product.

387.    The persons engaged in the Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of marketing, spearheaded by Rodan + Fields. Consultants who sell Rodan + Fields' products and unknowingly pass on or fail to disclose the above-described deceptions are un-witting co-conspirators in the Enterprise because, like their customers, they were not advised of the harmful side effects associated with Lash Boost that Rodan + Fields knew about.  Nonetheless, without these consultants' unwitting participation, Rodan + Fields could not and would not have sold Lash Boost to Plaintiffs and members of the Nationwide Class, and could not and would not have been able to disseminate its fraudulent representations concerning the effects of Lash Boost to consumers nationwide.

388.    The enterprise shares a common purpose: to sell Rodan + Fields' Lash Boost products. As directed by Rodan + Fields and reinforced by collaboration among consultants, the shared purpose of the Enterprise is to maximize sales of Lash Boost, by aggressive marketing and fraudulent means.

389.    There is a structure and organization with relationships among those associated in the Enterprise.  For example, Rodan + Fields holds annual conventions where thousands of its consultants attend and "hear the latest Rodan + Fields announcements and innovations."[73]  Notably, Lash Boost was originally introduced to its consultants at the 2016 Rodan + Fields convention in Las Vegas,

---

[73] *See* https://www.rodanandfields.com/ca/events.

attended by more than 15,000 consultants.[74]  The consultants are not merely engaging in parallel conduct, but collaborate with one another and are part of an "expanding network of dedicated social CEOs,"[75] as Rodan + Fields describes them.  Consultants' attendance at Rodan + Fields conventions where Lash Boost is promoted demonstrates that the Enterprise functions as a unit and that there are both interpersonal relationships and concerted actions among its members, even though the members of the Enterprise are discrete and independent persons or entities.  The Enterprise also has both the longevity and the scope sufficient to pursue its purpose.  The creators of the company, Dr. Katie Rodan and Dr. Kathy Fields, have been business partners for 35 years, Rodan + Fields now has over 200,000 consultants worldwide, and Rodan + Fields was the top-selling-skin-care brand in the U.S. last year, according to Bloomberg.[76]

390.    There is regular communication between Rodan + Fields and its consultants: these entities share information regarding products and marketing online, through U.S. mail, e-mail, and in Facebook groups, among other means.

391.    By failing to disclose adverse side effects, Rodan + Fields perpetuates the Enterprise's scheme, and continues to reap substantial profits.  Consultants similarly fail to disclose adverse side effects, albeit unknowingly, when they interact directly with customers to sell Rodan + Fields products.

392.    Rodan + Fields had a duty to disclose the serious adverse side effects associated with Lash Boost.  Consumers were entitled to know the adverse side effects of a product that could

---

[74] *See* YouTube, Highlights Convention 2016 Rodan + Fields (Oct. 11, 2016), https://www.youtube.com/watch?v=TxjlW0w8cC0; *See also*, Rodan + Fields Lash Boost, FACEBOOK, (Oct. 7, 2016) https://www.facebook.com/rodanandfieldsiRF/videos/1217700964957652/.
[75] https://www.rodanandfields.com/ca/events.
[76] Arienne Cohen, *The ProActiv Dermatologists Break the Billion-Dollar-Barrier-Again,* Bloomberg, (May 21, 2018), https://www.bloomberg.com/news/articles/2018-05-21/the-proactiv-dermatologists-break-the-billion-dollar-barrier-again.

potentially cause physical injuries, and when there was a relation of trust that Rodan + Fields garnered by advertising that their company was started by two doctors.  Rodan + Fields actively concealed material facts from consumers when it distinguished Lash Boost's side effects from the serious side effects associated with other drug products.  Further, Rodan + Fields made partial representations on its product warning label, but failed to fully disclose the adverse side effects associated with Lash Boost.

393.    Rodan + Fields designed the Lash Boost warning labels and website, but intentionally failed to disclose its adverse side effects.  Rodan + Fields did not advise the consultants, its un-witting co-conspirators, of the adverse side effects, and directed consultants to sell Lash Boost without advising either the consultants or their customers of these risks.  Rodan + Fields participated in and controlled the Enterprises' affairs through racketeering activity with the fraudulent intent to conceal the side effects of Lash Boost in order to increase sales.  Even after Rodan + Fields was notified by consumers of adverse reactions to Lash Boost, the Enterprise persisted in failing to disclose adverse side effects.

394.    The Enterprise achieved its common fraudulent purpose, in exchange for profits from the sale of Lash Boost, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including numerous instances of mail fraud in violation of 18 U.S.C. §§ 1341, and numerous instances of wire fraud in violation of 18 U.S.C. § 1343.  Rodan + Fields knowingly made material misstatements to the general public in furtherance of the fraudulent scheme regarding:

      A.    The actual side effects of Lash Boost;

      B.    The extent to which the product has adverse effects;

      C.    Whether Rodan + Fields acted with reckless indifference to the truth or falsity of their statements regarding Lash Boost side effects;

      D.    Lash Boost affirmatively misrepresented that it does not affect the structure or

function of the lashes; and

      E.   The nature and extent to which consumers experience side effects associated with use of the product.

395.    Rodan + Fields could not have accomplished the purpose of the Enterprise without the assistance of its consultants, who were unwitting co-conspirators. For Rodan + Fields to profit from the scheme it needed to convince consumers to buy its product without the overhead costs associated with selling its product in department stores and without disclosing the side effects of Lash Boost as its competitors, such as Latisse, do. Rodan + Fields did not educate or inform its consultants of all of the adverse effects associated with its product. The consultants then unwittingly perpetuated these omissions when selling Lash Boost to consumers. Without this, the Enterprise could not have achieved its common purpose.

396.    The Enterprise engaged in and affected interstate commerce because, *inter alia*, it manufactured, advertised, and sold Lash Boost products that were ultimately purchased and used by thousands of class members throughout the United States.

397.    The impacts of the Enterprise's scheme are ongoing: Lash Boost is still being sold without full disclosure of its harmful adverse side effects. Rodan + Fields and its consultants—all participants in the Enterprise—continue to profit from the sale of Lash Boost.

398.    Rodan + Fields and its independent sales consultants were each participants in the Enterprise whose participation was necessary to achieve the Enterprise's unlawful purpose, even if that participation was unknowing; the Enterprise and its members had a common fraudulent purpose and profit interest in the objective of the scheme; and the Enterprise functioned within a structure designed to effectuate the Enterprise's purpose—to profit through the unlawful sale of a potentially harmful product while concealing the product's harmful side effects.

**B.**    **Pattern of Racketeering Activity**

399.    Rodan + Fields conducted and participated in the affairs of the Enterprise through a

pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to

mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the

Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire

facilities (phone calls and electronic communications via e-mail or social media sites like Facebook) in

furtherance of the unlawful, deceptive and fraudulent scheme to defraud consumers by concealing the

adverse side effects of Lash Boost, and with the fraudulent pretense that the product would not affect

the structure of function of the lashes, for the purpose of defrauding consumers to obtain money.  Each

of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within

the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of

racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Rodan + Fields

intended to defraud plaintiffs, members of the class, and other intended victims.

400.    Each instance of racketeering activity alleged herein was related, had similar purposes,

involved the same or similar participants and methods of communication, and had similar results

affecting similar victims, including plaintiffs and members of the class.  Rodan + Fields calculated and

intentionally crafted its advertising, marketing, and labeling scheme to ensure profits remained high,

without regard for the consequences such behavior had on Plaintiffs and members of the class who

were not informed of the harmful effects associated with Lash Boost prior to purchasing it.  In

designing and implementing the scheme, Rodan + Fields was, at all times, cognizant of the fact that

those in the distribution chain rely on the integrity of their representations and warnings in purchasing

products.

401.    By intentionally omitting material information and failing to disclose harmful side

effects associated with Lash Boost to consumers, (including not disclosing that prostaglandin analogs

are classified as Pregnancy Category C drugs) and by claiming that Lash Boost does not affect the

structure or function of the lashes, Rodan + Fields engaged in a fraudulent, and deliberately deceptive,

course of conduct constituting a pattern of racketeering activity.

402.    Specifically, the Lash Boost labels uniformly omitted that Lash Boost could cause:

A.    iris pigmentation changes (that can be permanent),

B.    eyelid skin pigmentation changes, skin discoloration,

C.    changes to the eyelid which can cause droopy eyelids,

D.    could cause cysts,

E.    inflammation of the iris,

F.    could reactivate herpes simplex keratitis,

G.    and could impact vision.

H.    The label also did not warn consumers that an ingredient in Lash Boost has previously been classified as Pregnancy Category C.

403.    The Lash Boost label did not say that Lash Boost can *cause* irritation and inflammation or that it can lead to red, itchy, and flaky skin.  Rather, the warning said, "if you develop irritation or swelling, consult your physician."  This is not the same as advising someone in advance before deciding whether to use a product of the potential side effects.  Since Rodan + Fields was providing a warning label on its product, it had a duty to provide full and accurate warnings.

404.    Further, Rodan + Fields misstates on its website that "Lash Boost does not cause discoloration or change in pigmentation of the iris."  In fact, Lash Boost can cause eye color change and iris pigmentation changes are one of the most well-known and established side effects associated with prostaglandin analog use.

405.    Rodan + Fields also falsely represents that Lash Boost "will not affect the structure or function of your lashes."  Rodan + Fields acknowledged that other products used to improve lashes have "serious side effects" and distinguished themselves from those products.  The website reads: Question: "I have heard about side effects caused by drugs and other products used to improve lashes.

Should I be concerned about potential side effects from the use of Enhancements Lash Boost?"
Answer: "No. The only serious side effects we have heard about are those associated with drug
products, not cosmetics. ENHANCEMENTS Lash Boost is a cosmetic." The distinction does not
change the scientific fact that prostaglandin analogs like those Lash Boost contains have well-
documented adverse side effects that consumers ought to be advised of.

406.     Rodan + Fields' and its consultants' racketeering activities amount to a common course
of conduct, with a similar pattern and purpose, intended to deceive plaintiffs and members of the Class.
Each separate use of the U.S. Mail and/or interstate wire facilities employed by Rodan + Fields was
related, had similar intended purposes, involved similar participants and methods of execution, and had
the same results affecting the same victims, including Plaintiffs and members of the class. Rodan +
Fields has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing
business affairs of its Enterprise.

407.     The pattern of racketeering activity alleged herein, and the Enterprise are separate and
distinct from each other. Likewise, the consultants are separate and distinct from the Enterprise.

408.     The pattern of racketeering activity alleged herein, continues as of the date of this
complaint, and upon information and belief, will continue into the future unless enjoined by this Court.

C.     **Predicate Acts of Mail and Wire Fraud**

409.     To carry out, or attempt to carry out the scheme to defraud, Defendant, who is
associated in fact with the Enterprise, knowingly conducted and directly participated in the affairs of
the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(a)
and 1961(5), and employed the use of the interstate mail and wire facilities, in violation of 18 U.S.C. §
1341 (mail fraud) and § 1341 (wire fraud).

410.     Specifically, as alleged herein, Rodan + Fields has committed and conspired to commit
at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343),
within the past ten years. The multiple acts of racketeering activity that Rodan + Fields committed

were related to each other, posed a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity." The racketeering activity was made possible by Rodan + Fields' regular use of the facilities, services, distribution channels, and employees of the Enterprise. Rodan + Fields participated in the scheme to defraud by using the mail, telephone, and the Internet to transmit mailings and wires in interstate commerce.

411. Rodan + Fields used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

412. In devising and executing the illegal scheme, Rodan + Fields devised and knowingly carried out a scheme to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Rodan + Fields committed these racketeering acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the illegal scheme.

413. Rodan + Fields' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A. Mail Fraud: Rodan + Fields violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to develop, manufacture, market, and sell Lash Boost by means of false pretenses, misrepresentations, promises, and omissions.

B. Wire Fraud: Rodan + Fields violated 18 U.S.C. § 1341 by transmitting and/or receiving, or causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false

pretenses, misrepresentations, promises, and omissions.

414.   The Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of misleading information concerning the Lash Boost product; the transmission of payments to consultants for selling the product; and the transmission of false or incomplete statements intended to mislead consumers regarding the existence, severity, and duration of adverse side effects of Lash Boost.

415.   During the class period, the Enterprise's unlawful conduct and wrongful practices were carried out by an array of consultants and employees, working across state boundaries, who necessarily relied upon the frequent transfer of documents, information, products, and funds by U.S. Mail and interstate wire facilities.

416.   Rodan + Fields' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Rodan + Fields or third parties that were foreseeably caused to be sent as a result of Rodan + Fields' illegal scheme:

A.   the Lash Boost products themselves;

B.   sales and marketing materials, including advertising, packaging, and labeling, concealing the true nature of the Lash Boost product, which failed to disclose all of its adverse side effects;

C.   misleading results relating to its "consumer study" and claims that Lash Boost was "thoroughly tested;"

D.   documents and communications indicating Lash Boost will not "affect the structure or function of your lashes;"

E.   documents and communications indicating that Lash Boost "does not cause discoloration or change in pigmentation of the iris;"

F.   false or misleading communications intend to prevent consumers and the public from

discovering that Lash Boost had similar "serious side effects" to similar products that Rodan + Fields attempted to distinguish from Lash Boost;

G.      documents intended to facilitate the sale of Lash Boost, including invoices, shipping records, and correspondence;

H.      documents to process and receive payment for Lash Boost by unsuspecting Class members, including invoices and receipts;

I.      millions of dollars in compensation to Rodan + Fields;

J.      deposits of proceeds; and/or

K.      other documents and things, including electronic communications.

417.      Rodan + Fields (or their agents), for the purpose of executing this deceptive scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of Lash Boost and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| Rodan + Fields | Akemi Buckingham | May 2017 | Shipment of Lash Boost in the mail |

418.      As demonstrated by the specific act above, Rodan + Fields routinely mailed Lash Boost products directly to consumers.[77]  Each of these shipments included an inadequate and misleading warning label.  To further demonstrate how its products are shipped directly from the company to the consumer the shipping options and costs for mailing Rodan + Fields products are available online on the Rodan + Fields website, which demonstrates that using the mail to ship Lash Boost and accompanying misleading material to consumers was not an isolated event, but itself an essential and

---

[77] Mary Hanbury, *The most popular skin care brand in America can't be bought in stores,* Business Insider (April 22, 2018), http://www.businessinsider.com/most-popular-skincare-company-in-america-rodan-fields-2018-4 ("products are shipped directly from the company to consumer.")

necessary part of Rodan + Fields' pattern of racketeering activity.[78]

419.    Rodan + Fields (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| Rodan + Fields noreply@myrandf.com | Akemi Buckingham | May 16, 2017 | E-mail correspondence re product order and shipment status of Lash Boost |
| fRodan + Fields | Public | January 2018 | Distributed information re consultants' compensation plan on the internet.[79] |
| Rodan + Fields | Public | October 2016 | Event promotion for 2016 Convention where Lash Boost was launched.[80] Includes misleading Youtube promotional video. |
| Rodan + Fields | Public | July 31, 2017 | Frequently Asked Questions product safety information published on Rodan + Fields website: "Lash Boost is clinically and ophthalmologist tested, and found to be safe and non-irritating….Enhancements Lash Boost is a cosmetic product designed to improve the appearance of your lashes. It is not a drug product and will not affect the structure and function of your lashes." |

[78] Rodan + Fields, U.S. Shipping And Delivery, https://www.rodanandfields.com/Pages/shipping (last visited Aug. 13, 2018).
[79] Rodan + Fields Compensation Plan Overview, https://www.rodanandfields.com/assets/us/compensation-plan.pdf (last visited Aug. 13, 2018).
[80] Rodan + Fields Convention 2016, https://www.reg.rodanandfieldsevents.com/ehome/rfconvention2016/home/ (last visited Aug. 13, 2018)

| | | | In the same document, the consumer study results indicate that "85% of subjects noticed an improvement in the appearance of long lashes compared to baseline."[81] |
|---|---|---|---|

420.    In addition to distributing Lash Boost products via mail, Rodan + Fields uses the wires to inform customers that their product orders have shipped.  Although the shipment notifications themselves contain no false information, the notification is incident to an essential part of the scheme and was a necessary step in distributing and selling the Lash Boost product without advising consumers of the serious side effects associated with the product.  Further, advertising for Rodan + Fields conventions is also a step in the scheme to use its consultants to push the Lash Boost product on unknowing consumers.

421.    Rodan + Fields also used the internet and other electronic facilities to carry out the scheme and conceal its ongoing fraudulent activities.  Specifically, Rodan + Fields made misrepresentations on its website, and through statements online, all of which were intended to mislead and deceive consumers about the Lash Boost product and to increase sales.

422.    Part of Rodan + Fields' advertising campaign is use of social media.  For example, Rodan + Fields used its Facebook page to promote Lash Boost.  Before and after photographs from its Facebook page (www.facebook.com/pg/rodanandfields/photos) are displayed below:

---

[81] 2017 Rodan + Fields FAQ, *supra* note 57.



423.    In an April 16, 2018, press release, the company stated that it "achieved more than $1.5B in revenue in 2017 thanks to its innovative skincare products, disruptive consumer connected commerce model and powerful Independent Consultant Community."  The Chief Financial Officer, Chris Newman stated, "As an *industry disruptor*, we project double-digit growth for the next five years, and expect to continue to be a global leader *pushing the boundaries* of skincare and social commerce."[82]  Rodan + Fields has been using the mail and wires to push the boundaries of consumer safety by concealing and/or failing to disclose the serious side effects associated with Lash Boost.  The mail and wire transmissions described herein were made in furtherance of Defendant's scheme and common course of conduct to deceive consumers and lure consumers into purchasing Lash Boost, which Rodan + Fields knew had serious side effects, despite its advertising representations that Lash Boost is "safe and non-irritating."

424.    Rodan + Fields also used the mail and wires to communicate with customers who reported negative side effects to further mislead consumers in an effort to keep the Enterprise going.

425.    The nature and pervasiveness of the fraud scheme, which was orchestrated from Rodan + Fields headquarters, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

---

[82] Rodan + Fields Press Release, "Rodan + Fields Named the #1 Skincare Brand in the U.S. and North America in 2017" April 16, 2018, https://www.rodanandfields.com/pages/press-rodan-and-fields-number-one-skincare-brand-us-north-america (last visited Aug. 13, 2018).

426.    The precise dates of each of the Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) are identifiable through discovery.  However, even without discovery, plaintiffs can describe in detail the substance of the communications constituting the predicate acts of mail fraud and wire fraud, and how those acts furthered the scheme.

427.    Rodan + Fields' use of the U.S. Mail and interstate wire facilities to perpetrate the deceptive marketing fraud scheme involved thousands of communications through the class period, including the things and documents described in the preceding paragraphs and, *inter alia*:

A.    Marketing materials and welcome packets (entitled Business Kits or Business Portfolios) were sent to consultants across the country, which omitted the nature and extent of harmful side effects associated with Lash Boost;

B.    Written representations regarding Lash Boost distributed to consumers, including the inadequate and inaccurate warning label;

C.    Written representations and telephone calls between consultants and consumers regarding Lash Boost;

D.    Written representations on the Rodan + Fields website that mispresented that Lash Boost would not affect the structure or function of the lashes, which was designed to conceal the scheme and deter customer concerns;

E.    The existence of a "nurse line" to answer product related questions for consumers.  Rodan and Fields stated on its website that "Nurse Mary and her team of Nurses and trained product experts at the RF Connection stand ready to answer your product and skin related questions.  Contact the RF Connection today at RFConnection@rodanandfields.com or 415.273.8000"[83]

_____
[83] Rodan + Fields DermRF, http://www.dermrf.com/our-contributors/ (last visited Aug. 13, 2018).

F.   Transmission of payments via U.S. Mail and interstate wire facilities to consultants resulting from the sale of Lash Boost on the basis of Rodan + Fields' deceptive representations and omissions; and

G.   Receipts of sales proceeds sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

428.   In addition to the above-referenced predicate instances of mail and wire fraud, it was foreseeable to Rodan + Fields that publications containing fraudulent representations regarding Lash Boost would be distributed through the U.S. Mail (in its product packaging material) and by interstate wire facilities, and that Rodan + Fields would obtain money from consumers—Plaintiffs and class members—who received such publications through the mail.

429.   Rodan + Fields did not undertake the practices described herein in isolation, but as part of a common scheme and conspiracy.  As described herein, Rodan + Fields engaged in a pattern or related and continuous predicate acts for years, since the launch of Lash Boost.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining monies and revenues from Plaintiffs and Class Members based on their misrepresentations and omissions, while providing Lash Boost products that were worth significantly less than the purchase price paid because they failed to warn of serious side effects.  The predicate acts were related and not isolated events.

**D.   Damages Resulting From Enterprise Racketeering Activity**

430.   Rodan + Fields' violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and class members to suffer economic damages in that they did not receive what they paid for when purchasing Lash Boost.  Plaintiffs were wrongfully deprived of their money when the serious side effects associated with Lash Boost were not disclosed to them prior to purchasing the product.  Plaintiffs overpaid for Lash Boost because of Rodan + Fields' deceptive conduct.

431.     Plaintiff's injuries, and those of the class members, were proximately caused by Rodan + Fields' conduct of and participation in the Enterprise's racketeering activity. But for the misstatements and omissions made by Rodan + Fields and propagated through the Enterprise, plaintiffs and other similarly situated consumers would have decided not to purchase Lash Boost or would have paid less for the product.

432.     Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms from Rodan + Fields' fraudulent scheme.

433.     By virtue of these violations of 18 U.S.C. § 1962(c), Rodan + Fields is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to18 U.S.C. § 1964(c).

## VI.     EXEMPLARY/PUNITIVE/TREBLE DAMAGES – RESERVATION OF RIGHTS

434.     Plaintiffs incorporate by reference all other allegations in this Complaint as if fully restated here.

435.     Plaintiffs reserve their rights to seek exemplary/punitive/treble damages insofar as they are allowed by applicable laws.

## VII.     DEMAND FOR JURY TRIAL

436.     Plaintiffs respectfully request a trial by jury on all claims triable as a matter of right.

## VIII.     PRAYER FOR RELIEF

437.     WHEREFORE, Plaintiffs individually and on behalf of all those similarly situated, pray for judgment and the following relief:

A.     Certifying the Classes descried herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring Rodan + Fields' Lash Boost marketing, advertising, website, and Lash Boost label misleading and deceptive;

C.      Granting Plaintiffs and the Nationwide Class and State Classes awards of actual and compensatory damages in such amount to be determined at trial and as provided by applicable law;

D.      Granting Plaintiffs, and the Nationwide Class and State Classes a refund of all monies unlawfully obtained by Rodan + Fields by means of its deceptive or unfair marketing and/or labeling of Lash Boost;

E.      Granting Plaintiffs, and the Nationwide Class and State Classes awards of restitution of Rodan + Fields' profit from its deceptive or unfair marketing and/or labeling of Lash Boost;

F.      Granting Plaintiffs and the Nationwide Class treble damages under RICO;

G.      Granting Plaintiffs and the Nationwide Class and State Classes pre-judgment and post-judgment interest;

H.      Granting Plaintiffs, the Nationwide Class, and State Classes reasonable attorneys' fees and costs of suit; and

I.      Granting Plaintiffs, the Nationwide Class, and State Classes such other and further relief as this Court deems just and proper under the circumstances.

DATED this 14th day of August, 2018.

KELLER ROHRBACK L.L.P.


By */s/ Juli Farris*
Juli Farris (Bar No. 141716)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496; Fax: (805) 456-1497
jfarris@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

Michael D. Woerner, *admitted pro hac vice*
Ryan McDevitt, *pro hace vice forthcoming*
Benjamin Gould (Bar No. 250630)
Erika M. Keech, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
mwoerner@kellerrohrback.com
rmcdevitt@kellerrohrback.com
bgould@kellerrohrback.com
ekeech@kellerrohrback.com

*Interim Lead Counsel*


Marc Godino (Bar No. 182689)
GLANCY PRONGAY & MURRAY
1925 Century Park E, Suite 2100
Los Angeles, CA 90067
(310) 201-9150; Fax: (310) 201-9160
mgodino@glancylaw.com

*Interim Class Counsel*

Rosemary Rivas (Bar No. 209147)
LEVI & KORINSKY
44 Montgomery Street, Suite 650
San Francisco, CA 94104
(415) 291-2420; Fax (415) 484-1294
RRivas@zlk.com
Joseph Sauder
SAUDER & SCHELKOPF
555 Lancaster Avenue
Berwyn, PA 19312
(888) 711-9975; Fax: (610) 421-1326
jgs@sstriallawyers.com
***Attorneys for Plaintiffs***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to parties and attorneys who are filing users.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 14, 2018

*/s/ Juli Farris*
Juli Farris (Bar No. 141716)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496; Fax: (805) 456-1497
jfarris@kellerrohrback.com