STEPTOE & JOHNSON LLP

STEPHANIE A. SHERIDAN, State Bar No. 135910
ssheridan@steptoe.com
ANTHONY J. ANSCOMBE, State Bar No. 135883
aanscombe@steptoe.com
MEEGAN B. BROOKS, State Bar No. 298570
mbrooks@steptoe.com
Spear Tower, 1 Market Street, Suite 3900
San Francisco, CA 94105
Telephone: (415) 365-6700
Facsimile: (415) 365-6699

DARLENE K. ALT, *Admitted Pro Hac Vice*
dalt@steptoe.com
MARY E. BUCKLEY, *Admitted Pro Hac Vice*
mbuckley@steptoe.com
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300
Facsimile: (312) 577-1370

Attorneys for Defendant
RODAN & FIELDS, LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| BARBARA LEWIS, AKEMI BUCKINGHAM, BOBBIE JOE HULING, CYNTHIA WHETSELL, MARTHA MERLE, ELAINA HUFNAGEL, TERESA GATTUSO, ELISSA WAGNER, and DIXIE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RODAN & FIELDS, LLC, a California limited liability,<br><br>Defendant. | Case No. 4:18-cv-02248-PJH<br>(Consol. with No. 4:18-cv-02505-PJH)<br><br>**RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN BOEDEKER**<br><br>Assigned To: Judge Phyllis J. Hamilton<br><br>Hearing Date:   September 9, 2020<br>Hearing Time:   9:00 a.m.<br>Courtroom:      3 – 3rd Floor<br><br>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED |

Case No.: 4:18-cv-02248-PJH

RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN BOEDEKER

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     Plaintiffs' Price Premium Measure of Damages and Conjoint Study ............................2

III.    Summary of the Boedeker Report ......................................................................3

IV.     Reports of David Bradford Ph.D. and Ben Scher................................................5

V.      LEGAL STANDARD ........................................................................................9

VI.     ARGUMENT................................................................................................ 11

        A.      Boedeker's Report and Opinions Should be Excluded Because He Has Not
                Performed His Proposed Study....................................................... 11

        B.      Boedeker's Proposed Model Cannot Reliably Assess an Alleged Price Premium
                Because his "but-for" "price" Calculation is Not at the Intersection of Supply and
                Demand........................................................................................ 12

        C.      Reduced "Willingness to Pay" is Not a Price Premium................................ 14

        D.      Boedeker's Proposed Experimental Design Will Yield Biased Estimates.................... 16

        E.      Boedeker's Conjoint Analysis Fails to Replicate Actual Marketplace Conditions. ...... 17

VII.    CONCLUSION ............................................................................................ 20

RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN
BOEDEKER

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adams v. Target Corp.*,
    2014 WL 12558858 (C.D. Cal. 2014) ................................................................................. 17

*Am. Honda Motor Co., Inc. v. Allen*,
    600 F.3d 813 (7th Cir. 2010).............................................................................................. 11

*Apple, Inc. v. Samsung Electronics Co.*,
    2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ................................................................. 14, 15

*Brazil v. Dole Packaged Foods, LLC*,
    2014 WL 2466559 (N.D. Cal. May 30, 2014).................................................................... 19

*Brazil v. Dole Packaged Foods, LLC*,
    2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) .......................................................................2

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).........................................................................................................9, 10

*Davidson v. Apple, Inc.*,
    2018 WL 2325426 (N.D. Cal. May 8, 2018), *appeal dismissed sub nom. Siegal v. Apple
    Inc.*, 2018 WL 6131860 (9th Cir. Aug. 24, 2018)................................................................1

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir.2011).......................................................................................... 10, 11

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014).............................................................................................. 10

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
    326 F.R.D. 592 (N.D. Cal. 2018) .........................................................................................2

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) .................................................................................. 10, 11

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    320 F.R.D. 326 (D.N.H. 2017)..............................................................................................2

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) .................................................................... 17

*In re Gen. Motors LLC Ignition Switch Litig.*,
    427 F. Supp. 3d 374 (S.D.N.Y. 2019)................................................................ 1, 12, 14, 16

*In re NJOY, Inc. Consumer Class Action Litig.*,
　120 F.Supp.3d 1050 (C.D. Cal. 2015) ................................................................. 2, 14, 15, 16

*In re Paoli R.R. Yard PCB Litig.*,
　35 F.3d 717 (3d Cir. 1994) ...................................................................................... 10

*In re Scotts EZ Seed Litig.*,
　304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................................. 19

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999) .................................................................................................. 10

*Malletier v. Dooney & Bourke, Inc.*,
　525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................................... 17

*Marlo v. United Parcel Serv., Inc.*,
　251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) ................. 17

*Mezzadri v. Med. Depot, Inc.*,
　2016 WL 5107163 (S.D. Cal. May 12, 2016) ......................................................... 11

*Oracle Am., Inc. v. Google Inc.*,
　2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ........................................................... 3

*Ralston v. Mortg. Inv'rs Grp., Inc.*,
　2011 WL 6002640 (N.D. Cal. Nov. 30, 2011) ....................................................... 10

*Randolph v. J.M. Smucker Co.*,
　303 F.R.D. 679 (S.D. Fla. 2014) ............................................................................. 19

*Rodriguez v. It's Just Lunch Intl.*,
　2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018) .......................................................... 19

*Saavedra v. Eli Lilly & Co.*,
　2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........................................... 2, 11, 14, 15

*Townsend v. Monster Beverage Corp.*,
　303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........................................................ 2, 16, 19

*United States v. Cartwright*,
　411 U.S. 546 (1973) .................................................................................................. 12

*Werdebaugh v. Blue Diamond Growers*,
　2014 WL 2191901 (N.D. Cal. May 23, 2014), *class decertified*, 2014 WL 7148923
　(N.D. Cal. Dec. 15, 2014) ......................................................................................... 19

**Other Authorities**

Black's Law Dictionary 4th ed. ......................................................................................... 12

Fed. R. Ev. 702 ................................................................................................................ *passim*

Fed. R. Civ. P. 23(a) and (b) ...................................................................................... 11

S. Diamond, *Reference Guide on Survey Research*, REFERENCE MAN. ON SCIENTIFIC EVID,
     2d. ed. 2000 ........................................................................................................... 17

iv.                          Case No.: 4:18-cv-02248-PJH

RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN
BOEDEKER

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE:** On September 9, 2020 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the above-entitled Court, at 1301 Clay Street, Oakland, California, Defendant Rodan & Fields, LLC ("RF") will and hereby does move for an order excluding the report and opinions of Plaintiffs' expert Stefan Boedeker, pursuant to Fed. R. Ev. Rule 702 and *Daubert*.

Plaintiffs' only evidence of purported class-wide damages is the expert report of Stefan Boedeker submitted with their class certification motion.  Boedeker has yet to collect any data or complete his proposed conjoint survey.  In his report, Boedeker proposes a damages methodology and conjoint study that suspend traditional economic principles and discard the recognized legal framework for awarding price premium damages.  Boedeker's proposed methodology is fundamentally flawed and should accordingly be excluded.

This Motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities in support of the Motion; the Declarations of Dr. David Bradford and Ben Scher, submitted in Opposition to Plaintiffs' Motion for Class Certification; and on all other matters that may be judicially noticed or produced at the hearing of this matter.

DATED: July 3, 2020                    STEPTOE & JOHNSON LLP

                                       By: */s/ Anthony J. Anscombe*
                                       Stephanie Sheridan
                                       Anthony J. Anscombe
                                       Meegan B. Brooks

                                       Attorneys for Defendant
                                       RODAN & FIELDS, LLC

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This Court should exclude the opinions of Plaintiffs' economist, Stefan Boedeker, in accordance with Fed. R. Ev. 702.  He has not come forward with any calculation of class-wide damages, nor has he proposed a viable methodology to do so.   His planned conjoint study will measure the wrong information, from the wrong people, in a manner so divorced from economic and behavioral reality as to be irrelevant.  His purported goal – finding the price that Rodan + Fields ("RF") would have to charge, whilst giving stronger warnings, in order to sell as much Lash Boost as it did – bears no resemblance to a legally cognizable "price premium."   His focus on a counterfactual demand curve ignores the role that supply-side behaviors play in determining market price.   His conjoint study of consumer "willingness to pay" would have RF set its prices at a level so low as to capture every last sale from the customer *least* willing to buy Lash Boost – something that no rational economic actor would do.  And Boedeker need not go through the charade of a conjoint study to discover this price.  Instead, he could just read Plaintiffs' testimony that they would pay $0 for Lash Boost.

As explained by Defendant's experts, David Bradford, Ph.D. and Ben Scher, Boedeker's proposed study is not based on reliable economic principles, reliably applied.  At least two other courts have recently excluded Mr. Boedeker's opinions for reasons similar to those here.  *See, e.g., In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 391 (S.D.N.Y. 2019) ("Boedeker's testimony is insufficient as a matter of law to support the essential element of damages because he assumes that the supply curve is vertical, reimagining sellers as conscripted to produce and sell their products at whatever price consumers are willing to pay."); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *23 (N.D. Cal. May 8, 2018), *appeal dismissed sub nom. Siegal v. Apple Inc.*, 2018 WL 6131860 (9th Cir. Aug. 24, 2018) (rejecting Boedeker's damages model because it was inconsistent with plaintiffs' liability case and did not measure "only those damages attributable" to plaintiffs' theory of liability). This Court should do likewise.

## II.     Plaintiffs' Price Premium Measure of Damages and Conjoint Study

Plaintiffs contend that RF extracted a "price premium" from customers by failing to disclose Lash Boost's potential health risks. (Motion for Class Certification ("Pl. Mot.") at 21.) Had they known of its risks, they would have paid less, and the market value of Lash Boost would have been less.  They posit that this price premium – the difference between the price paid and the price that the product would have had in the presence of full disclosures – constitutes a measure of class wide damage. (*Id.*) A price premium is "the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received."  *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6, 2014).

Plaintiffs contend that a conjoint analysis is an acceptable methodology for calculating the alleged price premium attributable to RF's purported omission.  (Pl. Mot. at 21.) Although courts have sometimes approved conjoint analyses in class actions, they have done so only when the conjoint analyses sufficiently consider supply-side realities. *See, e.g., Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 605 (N.D. Cal. 2018); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 334–36 (D.N.H. 2017).  By contrast, courts routinely find conjoint studies inadmissible where they do not consider supply-side realities.  *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (finding that where plaintiffs' expert only looked to the demand side of the market equation and ignored supply, the expert's method of computing damages turned into nothing more than the measurement of what an average consumer wants, while ignoring the seller's willingness to sell); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F.Supp.3d 1050, 1119 (C.D. Cal. 2015) (The expert's "conjoint methodology could quantify the relative value a class of consumers ascribed to the safety message, but it does not permit the court to turn the relative valuation into an absolute valuation to be awarded as damages." (citation and quotation marks omitted)).

Courts also reject conjoint analyses that are performed in a biased and unreliable manner. *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1021 (C.D. Cal. 2018) (striking portions of

Boedeker's consumer survey and choice-based conjoint analysis where Boedeker modified the alleged misstatements in his survey making "any conclusions drawn from it and extrapolated to the actual alleged misrepresentations unreliable"); *Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012) (conjoint survey results were unreliable where the features selected to be surveyed omitted features that would have played an important role in real-world consumers' preferences).

## III.    Summary of the Boedeker Report

Plaintiffs assert that "Boedeker's model will determine the price associated with individual attributes of Lash Boost, by looking at the marginal consumer's willingness to pay." (Pl. Mot. at 21.)  In his report, Boedeker outlines a proposed methodology, which he has not yet conducted, which he says will quantify the impact of changing market conditions on consumers' choices and preferences through the use of a choice-based conjoint analysis.  (*See generally*, Expert Report of Stefan Boedeker (ECF No. 99) ("Boedeker Report").)  Although Boedeker acknowledges that "[m]arket price and market volume go hand-in-hand," *id.* at ¶22, this basic aspect of economics is absent from his ultimate proposed methodology, illustrated in his report at Figure 5.  In this figure, he does not even look at the supply curve, assuming no change to the quantity supplied by RF.



Figure 5: Compensation Required to Make Consumers Whole After Purchasing Product with Misrepresentation

Source: Illustrative Example Based on Hypothetical Data

Boedeker contends that his proposed conjoint analysis will measure economic loss "equivalent to the difference between the market price in the Actual-World and the price required to clear as much of the market in the But-For-World as possible." (*Id.* ¶ 32.) Boedeker's proposed conjoint survey entails having roughly 1,000 purchasers of "eyelash enhancement products" participate in a conjoint survey, which involves the following:

- Step 1: Require certain survey participants review a screen of purported side effects.  Other survey participants are not shown the screen.

- Step 2: Each set of participants completes a conjoint survey of hypothetical purchase decisions for hypothetical products with certain varying attributes.

- Step 3: Based on the survey responses of the two groups create both "but-for" (*i.e.*, for those shown the screen of purported side effects) and "actual" (*i.e.*, for those not shown the screen) demand curves.

- Step 4: Measure the difference between these two demand curves.

- Step 5: Evaluate the amount that RF would have to reduce its price for Lash Boost in order to

make the exact same sales that it made in Boedeker's "actual" world if the demand curve shifted

downward in Boedeker's "but-for" world.

(*Id.* at Section 3.)

Boedeker states that this conjoint analysis will allow him "to estimate a *demand curve* for a specific

combination of attribute levels." (*Id.* at ¶102 (emphasis added).)   Boedeker will then "compute the

economic loss as the vertical distance between (1) the *demand curve* for the Products with disclosure made

and (2) the *demand curve* for the Products without disclosure for all the price points in the range of prices

utilized in the conjoint study." (*Id.* at ¶104 (emphasis added).)   According to Boedeker, these "proposed

simulations of product attribute changes on price will reveal if and by how much the *demand curves* have

shifted between the Products with disclosure that are believed to be true and the Products without

disclosure. If the *demand curve* shifts downward … then the results from the conjoint analysis will indicate

that consumers would pay a lower price for the Product with disclosure and will quantify the economic

loss consumers endured when they were misled about the misrepresentations." (*Id.* at ¶106 (emphasis

added).)

IV.    **Reports of David Bradford Ph.D. and Ben Scher**

In support of its Opposition to Plaintiffs' Motion, RF has submitted the expert reports of David

Bradford, Ph.D. and Ben Scher, which address the flaws in Boedeker's proposed methodology.

**Dr. David Bradford**

Dr. Bradford is a healthcare economist, and the George D. Busbee Chair of Public Policy and

a Professor in the Department of Public Administration and Policy at the University of Georgia. He

has over 29 years of research experience in the area of health economics.  He has published 77 articles

in peer-reviewed publications and authored another 35 reports and other publications, including 12

book chapters and 13 studies and reports for various government entities including the U.S. Department

of Health and Human Services, the Veteran's Administration, and the South Carolina Medicaid Agency.

He has special interest and expertise in behavioral economics in the context of health.

Dr. Bradford concludes that Boedeker's proposed methodology does not involve sound and reliable economic methods. (Expert Report of David Bradford, Ph.D. (ECF No.140-6.) ("Bradford Report") at ¶5.)   His proposal will be incapable of calculating a but-for price, and thus cannot reliably assess the existence, or amount, of a price premium.  Addressing Boedeker's Figure 5, Dr. Bradford explains, "[t]o see the flaws in this approach, we need to look no further than the hypothetical supply curve shown in the graph. The orange supply curve shows that 5 units would only be supplied at a price of $116, not at the purported price of $75. At a price of $75, sellers would only be willing to supply approximately 3 units as opposed to the 5 units that his model assumes would be sold in the but-for world. This is evident by finding the volume (on the horizontal axis) for the orange supply curve that would occur at a price of $75 (shown on the vertical axis). Put simply, 5 units at a price of $75 may be what Mr. Boedeker (incorrectly) expects his own hypothetical consumers to demand, but it is not what suppliers would *supply*. Therefore, 5 units at $75 is simply not a market price or an outcome that would actually occur in a functioning market." (*Id.* at ¶10.)

Dr. Bradford explains that the market equilibrium—*i.e.*, the price and quantity at which the supply and demand curves intersect is actually "where to find the price and quantity at which buyers and the sellers are both willing to purchase and sell, respectively." (*Id.* at ¶11.)   Assuming Boedeker's other assumptions are correct (which Dr. Bradford explains they are not), Dr. Bradford illustrates that the but-for equilibrium price would be at the intersection of the yellow but-for demand curve and the orange supply curve (approximately $100). (*Id.*)



Figure 2: Replication of Mr. Boedeker's Figure 5 with market equilibriums

Boedeker's price premium, by ignoring the supply curve, is larger than basic economic logic would dictate. (*Id.*) Boedeker has not studied the supply curve at all, and assumes it is vertical. (*Id.* at ¶13.) Dr. Bradford illustrates how simply changing the hypothetical supply curves produces a different point of intersection with the but-for demand curve and hence a different but-for price under Boedeker's model. (*Id.* at ¶15.)



Figure 5: Replication of Mr. Boedeker's Figure 5 with hypothetical supply curves

Because Boedeker "does not plan to study the supply curve at all (either in the actual or but-for world), even if he could accurately measure the but-for demand curve, his model is incapable of determining which price in the above example would prevail in his but-for world." (*Id.* at ¶16.)

Dr. Bradford further notes that since Boedeker is not calculating a but-for market price, he is not actually estimating a price premium either. (*Id.* at ¶21.) Instead, Boedeker is merely attempting to

estimate a change in the price consumers are willing to pay, a distinct economic concept from a market price because market price also factors in supply considerations—*i.e.,* the price at which sellers are willing to sell. (*Id.* at ¶22.)

Addressing Boedeker's proposed conjoint surveys, Dr. Bradford explains that this proposed experimental design is "fundamentally flawed and does not mirror real world purchasing decisions," resulting in unreliable results with respect to estimating demand in the but-for world. (*Id.* at ¶35.) For example, participants in Boedeker's proposed survey "will be shown a full disclosure of the actual side effects of eyelash enhancement products in their introduction screen..." (Boedeker Report at ¶75.) Dr. Bradford observes that this is an inaccurate replication of the real-world purchase experience for eyelash enhancement purchasers, where consumers might view side effects listed on product packaging or on a website, but would not be forced to review them as part of the purchasing process. (Bradford Report at ¶37.)

Dr. Bradford opines that a substantial body of academic research demonstrates the variable and individualized impact that warning labels have on consumer choice, finding that consumers often do not read warnings at all, or when they do, they do not read them carefully and/or are unable to recall the warning's contents. (*Id.* at ¶38.) By forcing study participants to view a screen of side effects at the start of the survey, Boedeker creates a focusing bias, forcing focus on a topic—here alleged side effects—that consumers may not be focused on in the real world at all. (*Id.* at ¶39.)

**Ben Scher**

Mr. Scher has nearly 18 years of experience performing empirical analyses of large data sets and conducting statistical and economic analysis in the healthcare context. He received his B.S. from Cornell University in 2002 and has a Certificate in Data Analytics from the Cornell University SC Johnson College of Business. Mr. Scher is a Certified Health Data Analyst, a certification granted by the American Health Information Management Association, an organization for health information management professionals. He is a Partner at Bates White, LLC, a professional services firm that

conducts economic, statistical, and data analyses in a variety of industries and forums.

Mr. Scher shares Dr. Bradford's observations about flawed methodology, and finds additional problems with Boedker's proposed conjoint survey.  Mr. Scher conducted an analysis of a data set containing over 100 million records of actual RF sales data, which revealed important insight on the behavior of RF customers and the benefits they receive from Lash Boost.  (Expert Report of Ben Scher (ECF No. 140-3.) ("Scher Report") at ¶5.)  Mr. Scher opines that empirical evidence refutes Boedeker's foundational assumption that RF would reduce price in order to maintain quantity.  (*Id.* at ¶45.)  Mr.

██████████████████████████████████████████████████████████████████

████████████████████  (*Id.*)  This refutes Boedeker's assumption that price will fall when demand falls, and indicates a lack of class-wide harm. (*Id.*)  Scher notes an additional issue that "determining whether and to what extent each consumer would continue to purchase in the "but-for" world is an individualized issue and cannot be estimated using Mr. Boedeker's proposed approach." (*Id.*)

Mr. Scher also faults Boedeker's proposed selection of participants for his proposed survey, which fails to take into account several characteristics of real-world Lash Boost purchasers. (*Id.* at ¶50.) For example, Mr. Scher found that many Lash Boost customers purchase the product on a repeated basis, ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████  (*Id.*) Boedeker ignores the effects these realities would have on consumers' purchase and demand, and thus his proposed survey "runs the risk of focusing on a set of participants that are unrepresentative of the actual customers that purchased Lash Boost and therefore being unreliable." (*Id.*)

## V.   LEGAL STANDARD

The Federal Rules of Evidence require that an expert's opinions be "based on sufficient facts and data," be the "product of reliable principles and methods," and that the expert "reliably appl[y] those principles and methods to the facts of the case." Fed. R. Ev. 702.  Under Fed. R. Ev. Rule 702

and *Daubert*, federal courts serve as gatekeepers to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 589 (1993).  *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The party offering the expert bears the burden of proof that the expert satisfies Rule 702 and *Daubert* admissibility requirements. *Daubert*, 509 U.S. at 592 n.10 (1993); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014).

    To be relevant, the testimony must "help the trier of fact . . . to determine a fact in issue." Fed. R. Ev. 702(a).  That is, the expert's opinion must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citations omitted); *see also id.* at 591–92.  An expert's damage calculations must also fit the damages permitted by law.  *See Ralston v. Mortg. Inv'rs Grp., Inc.*, 2011 WL 6002640, at *8 (N.D. Cal. Nov. 30, 2011) (excluding testimony of expert who relied on damages theory precluded by law).

    To be reliable, the testimony must be based upon "sufficient facts or data," and be "the product of reliable principles and methods" that have been "reliably" applied to the "facts of the case." Fed. R. Ev. 702 Advisory Committee's Notes (2000 Amendment).  Expert opinions must be "derived by the scientific method," "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known," and scientifically reliable—based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (it is the district court's duty "to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.").  Furthermore, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*"  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis in original).

    The *Daubert* standard applies to expert testimony presented in support of or opposition to a motion for class certification. *In re ConAgra Foods*, 302 F.R.D. at 548 (citing *Ellis v. Costco Wholesale Corp.*,

657 F.3d 970, 982 (9th Cir.2011)); *see also Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) ("[W]hen an expert's report or testimony is critical to class certification" "a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion.") (internal citation omitted)).

## VI.   ARGUMENT

### A.   Boedeker's Report and Opinions Should be Excluded Because He Has Not Performed His Proposed Study.

Boedeker has not actually done anything.  His report outlines a proposed damages methodology, but he has not actually collected any data nor completed a damages calculation.  In failing to present a substantive report, Plaintiffs have deprived RF of the opportunity to scrutinize Boedeker's full work against the standards of Fed. R. Ev. 702, and hinders consideration of how his calculations might affect the class certification criteria under Rule 23(a) and (b).  For example, if his proposed study threatens the commercial viability of Lash Boost, as seems to be his intent, that would affect the ability of the class representatives to protect the interests of class members who love the product and want to continue buying it.  Boedeker appears to be playing a game of peekaboo, perhaps hoping to elicit guidance on how he might conduct a proper study, but his existing report is an abject failure.

District Courts in California have excluded expert opinions where plaintiffs have advanced no damages model and this Court should do the same.  *See, e.g., Saavedra*, 2014 WL 7338930, at *6 ("Plaintiffs have done worse than not even advancing a reliable method of calculating classwide damages—they have advanced no damages model at all."); *Mezzadri v. Med. Depot, Inc.*, 2016 WL 5107163, at *11 (S.D. Cal. May 12, 2016) (same); *In re ConAgra Foods.*, 302 F.R.D. at 552 (refusing to consider expert's conjoint analysis-based damages model in putative consumer class action because expert failed to identify variables to be included in his model or data in his possession to which the model could be applied).

**B.    Boedeker's Proposed Model Cannot Reliably Assess an Alleged Price Premium Because his "but-for" "price" Calculation is Not at the Intersection of Supply and Demand.**

Determining market price or market value requires consideration of both (i) willingness to pay and (ii) willingness to sell.  Fair market value is commonly defined as "the price at which the property would change hands between a willing buyer and a willing seller." *United States v. Cartwright*, 411 U.S. 546, 551 (1973)); *see also* Black's Law Dictionary, 4th ed. ("market value" is "fair market value," which is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect").   Without evidence of the shape of the supply curve, no reasonable fact finder would be able conclude that the but-for price would be lower than the actual price plaintiffs paid, resulting in damages.  *In re Gen. Motors*, 427 F. Supp. 3d at 384.

Boedeker ignores this basic economic concept, explicitly planning *not* to study supply (*i.e.*, the schedule of prices at which RF would be willing to sell Lash Boost) in the but-for world. His model is incapable of calculating the price and quantity at which transactions would occur in the but-for world – a fundamental and irreparable flaw.  He functionally assumes a vertical supply curve, which yields the lowest possible but-for price among the various possibilities. (*See* Bradford Report at ¶16.)  Not only is this "fundamentally unreliable because it is not based on any analysis or study of the supply function, but it is also guaranteed to produce the most extreme difference between the actual and the but-for price (to the extent there would be any difference at all)." (*Id.*)

Boedeker's model is divorced from the reality of RF's business. ██████████████ ████████████████████████████████████████████████████████████████████ (Scher Report at ¶48.)

Another court has already rejected the proposed model Boedeker intends to use here.  In *In re Gen. Motors LLC Ignition Switch Litig.* the Court found that Boedeker's exclusive consideration of the demand curve rendered his opinions and proposed model inadmissible.  427 F. Supp. 3d at 391.  To

see how his opinion in this case compares to his excluded opinion in the GM Ignition Switch litigation,

the Court need only compare Boedeker's Figure 5 in this case...



Figure 5: Compensation Required to Make Consumers Whole After Purchasing Product with Misrepresentation

... to the court's representation of the model Boedeker presented to the U.S. District Court for the

Southern District of New York.



In rejecting Boedeker's model, the GM Court stated in its analysis that, "[s]ellers might not be

willing to accept the price that the quantity of buyers of non-defective products are willing to pay for

defective products, except at much lower quantities. In other words, sales of products with known

1    defects would not occur in the market at that price. That amount is, therefore, not the but-for market

2    price." *In re Gen. Motors*, 427 F. Supp. 3d at 385–86.

3        Dr. Bradford uses a hypothetical scenario to illustrate the absurdity of Boedeker's model. (*See*

4    Bradford Report at ¶¶18-19.)  In this scenario, 100 customers purchase Lash Boost in the actual world

5    at a price of $116, but in the but-for world, where alleged side effects are disclosed, one buyer is now

6    willing to pay $16, while the other 99 of those 100 customers are still willing to pay $116.  (*Id.* at ¶18.)

7    Dr. Bradford notes that, "[b]ecause Boedeker's construct involves finding the single price necessary to

8    sell the same quantity as in the actual world, his model would force [RF] to sell Lash Boost at a price of

9    $16 to all 100 customers in the but-for world in order to attract that 1 consumer who was substantially

10   affected." (*Id.* at ¶ 19.)  This scenario forces RF to forego $9,900 in revenue (the actual price of $116

11   minus the $16 but-for price for the 99 customers unaffected by the disclosure) to gain only $16 in

12   revenue from that 1 "marginal" customer. (*Id.* at ¶21.)  No rational company would make such a

13   decision. (*Id.*)

14

15       **C.    Reduced "Willingness to Pay" is Not a Price Premium.**

16       Boedeker's proposed model will not actually estimate a price premium, the measure of damages

17   Plaintiffs purportedly seek to recover.  Rather, his proposed model actually estimates a change in

18   "willingness to pay," a distinct economic concept from but-for market price because market price takes

19   supply considerations into account.  This is improper under the law. *Saavedra*, 2014 WL 7338930, at *5

20   ("The Court has found no case holding that a consumer may recover based on consumers' willingness

21   to pay irrespective of what would happen in a functioning market (*i.e.* what could be called sellers'

22   willingness to sell."); *see also, In re NJOY*, 120 F. Supp. 3d at 1122 ("A consumer's subjective valuation

23   of the purported [misrepresentation], measured by their relative willingness to pay for products with or

24   without the [misrepresentation], is not an accurate indicator of restitutionary damages, because it does

25   not permit the court to calculate the true market price of [the product] absent the purported

26   misrepresentations.") (emphasis omitted); *see also Apple, Inc. v. Samsung Electronics Co.*, 2014 WL 976898,

27

28

RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN
BOEDEKER

at *11 (N.D. Cal. Mar. 6, 2014) (rejecting damages model that failed to provide a way to compare "willingness to pay" metrics to the market price of the infringing devices, "which reflects the real-world interaction of supply and demand for infringing and non-infringing devices").

As a matter of basic economics, Boedeker's "would have been willing to pay" methodology cannot determine a market price. (*See* Bradford Report at ¶21.)  Boedeker claims to estimate the difference between the actual price paid and the willingness to pay for the single consumer most affected by the disclosure of alleged side effects, and then gives that difference back as damages to *each and every putative class member*. (*Id.*) This method results in a "damage" per purchase that is not at all reflective of a typical consumer's willingness to pay for Lash Boost where the alleged side effects are disclosed. (*Id.*) It is an extreme estimate that is too high for nearly all consumers and therefore orders of magnitude too high for the putative class as a whole. (*Id.*)  In fact, it will create inequities among the proposed class.  If his but-for price is anything other than $0, he will overcompensate all consumers who would pay more, and if his but-for price is above $0, he will undercompensate Plaintiffs, who want full refunds.

Courts routinely exclude conjoint analyses that purport to determine a decrease in market price when the expert fails to consider (i) real-world market prices; and/or (ii) willingness to sell.  For example, in *Saavedra*, 2014 WL 7338930, the Court rejected plaintiffs' conjoint analysis-based damage model for California's UCL and CLRA claims because it failed to consider willingness to sell:

> Dr. Hay proposes calculating class members' lost consumer value using conjoint analysis. . . . [His] model looks only to the demand side of the market equation.  By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants.  The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell). Id. at *4.  Similarly, in In re NJOY, the Court held that a "conjoint analysis" did not support class certification because it could only "quantify the relative value a class of consumers ascribed to [a] safety message" but did not "permit the court to turn the relative valuation into an absolute valuation to be awarded as damages."

120 F. Supp. 3d at 1119. The *NJOY Court* explained that "[t]he ultimate price of a product is a combination of market demand and market supply," but the expert's model looked "only to the demand

side of the market equation" and ignored the price the defendant was "willing to sell its products." 120 F. Supp. 3d at 1119.

Likewise, in *Apple, Inc. v. Samsung Electronics Co.*, 2014 WL 976898, the Court held that "the ultimate price of a product is a combination of market demand and market supply." *Id.* at *11. Thus, where a "survey measures the market demand for" particular product attributes "in a vacuum, without relation to the actual price or value of the" product, that "survey leaves the Court with no way to compare [the expert's] willingness to pay metrics—which relate only to demand for the…feature—to the market price of the [product], which reflects the real-world interaction of supply and demand for the products." *Id.*

### D.     Boedeker's Proposed Experimental Design Will Yield Biased Estimates.

The design of Boedeker's proposed experiment will likely produce biased results. Courts have excluded similar conjoint studies and opinions, including those offered by Boedeker, in the face of similar errors that taint the survey and "render it useless." *See, e.g., Townsend*, 303 F. Supp. 3d at 1049-50; *In re Gen. Motors*, 427 F. Supp. 3d at 385.

Here, participants in Boedeker's proposed but-for world survey "will be shown a full disclosure of the actual side effects of eyelash enhancement products in their introduction screen…" (Boedeker Report at ¶76.) In the real world, consumers would not be forced to read a screen with potential side effects before deciding whether to purchase a product. Rather, disclosures about the alleged side effects may be present in the product packaging or on the RF website, and consumers may or may not choose to review this information when purchasing the product. A proper experimental design would mirror the real world: consumers would have the *ability* to view the alleged side effects if they sought them out to review—either in the packaging or on the RF website—but they would not be *forced* to view them as part of the purchasing process. (Bradford Report at ¶37.)  Forcing customers to view a screen of alleged side effects at the start of the survey creates a "focusing illusion" in which consumers are forced to focus on alleged side effects that they may not focus on in the real world at all. (*Id.* at ¶39.)

1   Boedeker also does not provide any information about the likelihood of the risks of each side

2   effect, which could cause survey participants to overestimate the likelihood of the risk. (*Id.* at ¶40.) For

3   these reasons, the design of Boedeker's proposed survey clearly biases the survey in favor of Plaintiffs'

4   position.

5         **E.**      **Boedeker's Conjoint Analysis Fails to Replicate Actual Marketplace Conditions.**

6   Boedeker's survey also fails because it does not consider several characteristics of real-world

7   Lash Boost purchasers when selecting his sample of participants. As a result, his survey results will be

8   unrepresentative of the actual customers that purchased Lash Boost. In order "[f]or a survey to be

9   valid, 'the persons interviewed must adequately represent the opinions which are relevant to the

10  litigation.'" *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.,* 2017 WL 1196990, at *29

11  (N.D. Ill. Mar. 31, 2017); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580–81 (S.D.N.Y. 2007)

12  (expert must show "the proper universe was examined and the representative sample was drawn from

13  that universe." (citing S. Diamond, *Reference Guide on Survey Research*, REFERENCE MAN. ON SCIENTIFIC

14  EVID, 2d. ed. 2000, at 236-72)). Boedeker's proposed survey population consists of "those who have

15  purchased eyelash enhancement products during the relevant period in the United States." (Boedeker

16  Report at ¶55.) Boedeker provides no evidence that his proposed sample of "eyelash enhancement"

17  product purchasers replicates the characteristics of any well-defined target population, much less the

18  target population of class members. Because the proposed survey is non-representative, the results

19  could not be extrapolated to putative class members. *See Marlo v. United Parcel Serv., Inc.,* 251 F.R.D. 476,

20  485–86 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011).

21  Boedeker also ignores the actual behavior of RF customers and does not consider whether they

22  receive benefits from Lash Boost. *See Adams v. Target Corp.*, 2014 WL 12558858, at *3 (C.D. Cal. 2014)

23  ("conjoint analysis is not effective when the features that it focuses on are artificial because the analysis

24  does not reflect real-world consumer behavior"). Mr. Scher's analysis of a data set containing over 100

25  million records of actual RF sales data revealed important insight on the behavior of RF customers and

RODAN & FIELDS, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT STEFAN
BOEDEKER

1    the benefits they receive from Lash Boost. (Scher Report at ¶5.) Mr. Scher made the following empirical

2    findings, which Boedeker's proposed study fails to address:

3       • ████████████████████████████████████████████████████

4         ████████████████████████████████████████████████████

5         ████████████████████████████    Boedeker's proposed survey is

6         not designed to explicitly account for how first-hand experiences—often on a

7         continuous and repeated basis—with Lash Boost would affect choices and demand.

8       • ████████████████████████████████████████████████████

9         ████████████████████████████████████████████████████

10        ████████████████████████████    Boedeker's proposed model does not

11        explicitly account for how a prior relationship with RF or brand loyalty could impact

12        consumer choice and demand.  Rather, his survey construct is one in which purchasers

13        evaluate and choose among various options for "eyelash enhancement products"—

14        essentially, they are in the market and "shopping around." Given the pre-existing

15        relationship many customers have with RF, Boedeker's proposed model could not

16        replicate how these customers actually come to know of, and decided to purchase, Lash

17        Boost.

18      • ████████████████████████████████████████████████████

19        It is particularly unlikely that Consultants are shopping around for "eyelash

20        enhancement products" in a manner consistent with Boedeker's survey construct given

21        their relationship with RF.

22      • ████████████████████████████████████████████████████

23        ████████████████████    Boedeker's proposed survey has consumers choose among only

24        eyelash enhancement products, and therefore is not geared toward evaluating how

25        consumer interest in multiple products in the RF portfolio may affect purchasing

26        decisions.

27    (*Id.* at ¶50.)

28        Courts routinely reject price premium methodologies when the proposed methodologies do not

attempt to isolate the premium due only to the allegedly misleading statement. *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413 (S.D.N.Y. 2015) (citing *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *16 (N.D. Cal. May 30, 2014)); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014) (plaintiff failed to present a viable "price premium" damages model where they failed to demonstrate that the "model will isolate premium received by the inclusion of the alleged misrepresentation"); *Rodriguez v. It's Just Lunch Intl.*, 2018 WL 3733944, at *5 (S.D.N.Y. Aug. 6, 2018); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *23 (N.D. Cal. May 23, 2014), *class decertified*, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014). "These courts correctly point out consumers may pay a higher price for a product for many reasons that have nothing to do with specific advertising claims, including brand loyalty and product quality." *Id.*

Significantly, the Plaintiffs themselves have testified that in the but-for world they would not have purchased Lash Boost, but Boedeker's methodology forces them to buy Lash Boost anyway because his model requires the same exact quantity to be sold in the but-for world as was sold in the actual world. (Bradford Report at ¶¶15, 21.) Thus, his proposed model is inconsistent with claims of the Plaintiffs, unless he determines that the but-for market price is $0. (*Id.* at ¶31.) RF would not sell the product for $0 (*i.e.*, give it away) on a routine and repeated basis to all customers in order to attract the customers that value the product the least.

Thus, not only is Boedeker's foundational assumption irreparably flawed, it is in direct conflict with the Plaintiffs' claims. While calculations need not be exact, the Plaintiffs' damages model "must measure only those damages attributable to Plaintiffs' theory of liability." *Townsend*, 303 F. Supp. 3d at 1048. Accordingly, Boedeker's proposed damages model and his opinions are inadmissible with respect to both liability and class certification.

## VII.    CONCLUSION

Boedeker's proposed damages methodology and opinions are "so flawed as to be completely unhelpful to the trier of fact," and do not pass muster under *Daubert* and Rule 702. They should be excluded for all purposes.

DATED: July 3, 2020                              STEPTOE & JOHNSON LLP
                                                 By:  _____/s/ Anthony J. Anscombe_____
                                                      ANTHONY J. ANSCOMBE
                                                      Attorneys for Defendant
                                                      RODAN + FIELDS, LLC